On October 15, 1999, Casey Ashlee, Ashley King, and Cody King were placed in emergency protective custody

THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 Charleston County Department of Social Services, Plaintiff, and John Roe and Mary Roe, Intervenors, Respondents,
 
 
 

v.

 
 
 
 Pamela King, Kenneth King, Jr., and Cody King, a child, D/O/B- 03/24/97, Defendants,
 of whom Pamela King is Appellant.
 
 
 

Appeal From Charleston County
 Frances  P. Segars-Andrews, Family Court Judge

Unpublished Opinion No.  2005-UP-155
Heard January 12, 2005  Filed March 4, 2005

REVERSED

 
 
 
 Robert V. DeMarco, of Charleston, for Appellant.
 Frampton  Durban, Jr., Chief Counsel Charleston Cnty. DSS, of N. Charleston and R. Glenn Lister, Jr., of Mt. Pleasant, for Respondent.
 Ellen Babb, of N. Charleston, and Ruth F. Buck, of Sullivans Island, for Guardian Ad Litem
 
 
 

PER CURIAM:  Pamela King appeals the family courts termination of her parental rights to her son Cody.  We reverse.
FACTS

In October of 1999, Pamela, her husband Kenneth King, and their three children, Casey, Ashley, and Cody, were traveling through South Carolina in route from Pennsylvania to make a new home in Texas near Pamelas family. At the time Casey was age 9, Ashley was almost 5, and Cody was approximately two and a half.[1]  On October 15, 1999, the children were taken into emergency protective custody by Charleston County Department of Social Services (DSS) after the parents were arrested for attempting to pass a fraudulent check at a Wal-Mart and what was identified as a crack pipe was found in Pamelas purse.  
In a March 20, 2000 order, the family court adopted a treatment plan agreed upon by DSS and the parents.  The court required the children to remain in DSS custody until the parents successfully completed a placement plan.  Among other things, this plan required substance abuse counseling, parental counseling, and counseling addressing anger management and criminal domestic violence.   
In February of 2000, Kenneth and Pamela moved to Hardeeville, South Carolina.  Pamela began working toward the completion of her treatment plan.  She completed her parenting classes in September of 2000.  In February of 2001, she completed a class on relationship issues sponsored by a family violence treatment center.  During this time, Pamela paid the child support obligation for approximately six months before beginning to pay it only sporadically.  Pamela testified that she paid the child support to the best of her ability.  
In October of 2000, the foster care review board recommended termination of the parental rights of Kenneth and Pamela.  Pamela testified that it was at this time she began using cocaine from October of 2000 until June of 2001 due to her despondency over losing her children and at Kenneths prompting.  She acknowledged that she continued using it until June of 2001.  In April of 2001, the family court issued a permanence planning order adopting a plan for all three children of termination of parental rights and adoption.  In the order, the court noted that there had been some compliance by Pamela but not enough to remedy the situation.  It allowed Pamela to continue visitation with the children.
Pamela had left Kenneth in February of 2001 and moved to Smoaks, South Carolina to live with her mother and stepfather.  She explained, I did a lot of soul searching.  I wasnt happy.  I was missing my kids.  I realized that I had a loser for a husband who was not helping me to get them back in any way. . . .  I just decided to turn my life around.  Things just fell into place after I left him.  In the time since she left Kenneth and moved to Smoaks, her life has greatly improved.  She found stable employment and lives with her mother and stepfather.  She testified she had not used drugs since June of 2001.  In September of 2002, she completed a year-long substance abuse program through drug court.[2]  In April of 2002, the guardian ad litem and foster care review board changed their recommendations from termination of parental rights to reunification.  Importantly, DSS accepted those recommendations as to Codys brother and sister and returned them to Pamela in November of 2002.  Casey, one of the children returned to Pamela, is autistic.  
While Pamela was working toward completion of her treatment plan, the children were living in separate foster homes.  Cody was eventually placed with the Shanklin family.  He stayed with this foster family for approximately two years, but was removed sometime prior to September of 2001.  While Cody was with the Shanklins, his pediatric endocrinologist, Dr. Steven Willi, diagnosed Cody as having psychosocial dwarfism or psychosocial failure to thrive.  Dr. Willi explained this condition occurs when a child is not being met with the appropriate nurturing behaviors from some parent or parent surrogate.  Mrs. Shanklin testified that when Cody was in their foster care, he initially would become sick after his visitation with Kenneth, Pamela, and his siblings, but this changed after Kenneth no longer participated in the visitations.  After that point, Cody looked forward to going, acted very lovingly toward Pamela, and would play with his mother, siblings, and grandparents.  Mrs. Shanklin also testified that during this time she made sure Cody understood that Pamela was his biological mother by placing a picture of his biological family near his bed and allowing him to have letters and cards from them.  Cody was removed from the Shanklin household by DSS when Mr. and Mrs. Shanklin temporarily separated, despite Mrs. Shanklins desire to continue taking care of him.  
When Cody was removed from the Shanklins foster care, he was temporarily placed in two households before being pre-adoptively placed with Kurtis Kendle and Gayle Kendall (hereinafter the Kendles[3]) in October of 2001.  A pre-adoptive placement means the family is being recommended as an adoption home for Cody by DSS.  Cody has by all accounts thrived in the Kendle household.
During the entire time Cody has been in foster care, Pamela has exercised every visitation offered her.   Initially visitation was twice a month, but DSS cut the visitation in half.  Thus, DSS limited Codys visitations with his mother to one hour a month. 
This action for termination of parental rights was filed in May of 2001.  DSS originally sought the termination of Pamela and Kenneths rights to all three children.  The Kendles were joined as intervenors in October of 2002.  At the hearing, DSS presented the testimony of two expert witnesses to demonstrate that it was in Codys best interests to stay with the Kendles.  
Dr. Elizabeth Ralston, a Ph.D. in clinical psychology and qualified as an expert in family reunification, testified that Cody does not identify Pamela as his natural mother or Casey and Ashley as his natural siblings.  However, she testified that based on observation, Pamela is a nurturing and loving mother to her children.  Dr. Ralston stated Cody is doing well with the Kendles, but admitted she is unsure if Cody has bonded with the Kendles or whether he is just employing a survival mechanism.  Dr. Ralston also testified that Cody is comfortable with Pamela, his siblings, and his grandfather.  Her opinion that Cody should remain with the Kendles was rooted in her belief that Cody is thriving with the Kendles and to remove him would be traumatic.  However, she acknowledged that when Cody was older and learned that that he had a brother and sister who were returned to their mother when he was not may also be traumatic, but she stated she could not predict the impact such knowledge would have on Cody.  
Dr. Charles Saylor, a forensic psychologist, testified Cody had resolved his earlier confusion at being placed with the Kendles.  He also testified that while Cody knew neither the Shanklins nor the Kendles were his biological parents, he could not identify Pamela as his biological mother.  However, Cody could identify Casey and Ashley as his siblings.  Dr. Saylor found Cody was in a good home where he is well cared for by . . . parents who are very capable and very devoted to him.  He concluded it would be in Codys best interest to be allowed to continue living with the Kendles and have closure. 
On cross-examination, Dr. Saylor admitted his evaluation did not include the overarching question of whether it is in the best interest of Cody to stay with the Kendles or be reunited with Pamela but was limited to determining whether Cody [has] adjusted to life with the Kendles.  He also admitted that if Pamela could present a nurturing, caring, loving home that would be okay for Cody.  Finally, Dr. Saylor testified Pamelas restricted visitation of one hour a month was not enough to create a bond with Cody.  
Ruth Buck, the guardian ad litem, testified that although she initially recommended termination of parental rights to the court in March of 2001 because she was dissatisfied with the parents progress with their treatment plans, she changed her position to reunification with Pamela in April of 2002.  She stated she changed her opinion because (1) Pamela was making progress, (2) Codys brother stated he wanted to be returned to Pamela, and (3) Pamela no longer had contact with Kenneth.  Buck testified that Pamela never missed a visit nor did the grandparents.  And I continued to see an improvement in the children in their relationship with the mother on the visits over the time.  Importantly, she testified Pamela was a fit mother and Cody has a good relationship with his brother and sister.  Most alarmingly, Buck accused DSS of having reserved Cody for adoption because he was very adoptable.  She testified that when she questioned Jacqueline Adams, a DSS adoption specialist, about the Kendles pre-adoptive status, Adams responded, We dont get many blue eyed blond children very often, and these people want Cody.  During her testimony, Adams denied making this statement.  
Gayle Kendall testified she baby-sits a friends twins one day a week at her own house but other than that does not have outside employment.  Kurtis Kendle is a homebuilder with an office in their home.  They live on the Isle of Palms walking distance from the beach.  Gayle Kendall stated they only applied to be pre-adoptive parents and absolutely did not apply to be foster parents.  Melissa Turner, a DSS adoption specialist, acknowledged that when Cody was placed with the Kendles, she told them that they could represent themselves as his parents and gave them a Medicaid card with the name Cody Kendle on it.  
          In its order, the family court found Buck was biased in favor of Pamela.  The family court found grounds for termination had been established in that (1) Pamela had failed to complete her placement plan within six months and was still not in compliance with the placement plan, (2) Pamela had failed to contribute to the support of Cody, and (3) that Cody had been in foster care under the responsibility of the State for fifteen of the most recent twenty-two months.  In addition, the court found it was in Codys best interests to terminate Pamela and Kenneths parental rights.  Pamela appealed the order of the family court.
STANDARD OF REVIEW

When reviewing a case involving the termination of parental rights, the best interests of the children are always the paramount consideration.  Doe v. Baby Boy Roe, 353 S.C. 576, 579, 578 S.E.2d 733, 735 (Ct. App. 2003).  Any ground serving as the basis for the termination of parental rights must be proved by clear and convincing evidence.  Richland County Dept of Soc. Servs. v. Earles, 330 S.C. 24, 32, 496 S.E.2d 864, 868 (1998).  In reviewing a termination of parental rights, the appellate court has the authority to review the record and make its own findings of whether clear and convincing evidence supports the termination.  South Carolina Dept of Soc. Servs. v. Ledford, 357 S.C. 371, 375, 593 S.E.2d 175, 176-177 (Ct. App. 2004).  
LAW/ANALYSIS

Under South Carolinas termination of parental rights (TPR) statute, [t]he family court may order the termination of parental rights upon a finding of one or more of the [listed] grounds and a finding that termination is in the best interest of the child.  S.C. Code Ann. § 20-7-1572 (Supp. 2004).  The family court found three grounds supported termination of Pamelas rights.  We will address each ground in turn.  
1.     Failure to contribute support
Pamela argues the family court erred when it found her failure to contribute child support as a ground for termination.  We agree.
A ground for termination of parental rights occurs when the child has lived outside the home . . . for a period of six months, and during that time the parent has wilfully failed to support the child.  S.C. Code Ann. 20-7-1572(4) (Supp. 2004).  The statute explains:  

 Failure to support means the parent has failed to make a material contribution to the childs care.  A material contribution consists of either financial contributions according to the parents means or contributions of food, clothing, shelter, or other necessities for the care of the child according to the parents means.  The court may consider all relevant circumstances in determining whether or not the parent has willfully failed to support the child, including requests for support by the custodian and the ability of the parent to provide support.

Id.  Wilfulness is conduct of the parent which evinces a settled purpose to forego parental duties . . .  because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent.  S.C. Dept of Soc. Servs. v. Wilson, 344 S.C. 332, 336, 543 S.E.2d 580, 582 (Ct. App. 2001) (quoting S.C. Dept of Soc. Servs. V. Broome, 307 S.C. 48, 53, 413 S.E.2d 835, 839 (1992)). Whether a parents failure to visit or support a child is wilful is a question of intent to be determined by the facts and circumstances of each case.  Id.
Pamela paid her child support obligation consistently until November of 2000, at which time the payments became sporadic.  She explained that at that time she was paying all of the bills for herself and Kenneth, who was not contributing at all.  As the family court noted in its order, Pamela also failed to make any payments from June of 2001 to December of 2001.  She began making payments again in January of 2002.  Pamela stated she made her child support payments the best that she could.  
Pamela admitted she did not make any payments after June of 2002, but stated it was not a wilful failure to support and that she simply believed she was in compliance with a court order.  On June 21, 2002, at DSSs request, the family court issued an order striking Pamelas child support arrearage and closing the case.  An October of 2002 consent order vacated the June court order, addressed the future need to recalculate the obligation, and did not require payment until December of 2002.  In a further order, dated January 6, 2003, the family court held enforcement of the child support obligation in abeyance until the parental rights hearing.  As Casey and Ashley were returned to Pamela in November 2002, revision of the amount of support being paid was needed.   
Pamela made child support payments as she was able and her most recent and substantial failure is explained by her understanding of a court order holding them in abeyance until a final hearing on her parental rights.  We find this misunderstanding as to her continued requirement to pay mitigates her failure to provide support and hold it was not wilful.  Therefore, we find the family court erred in terminating her rights based on a wilful failure to provide support.
2.     Failure to complete placement plan within six months
Pamela argues the court erred in finding her parental rights should be terminated for her failure to complete her placement plan within six months.  We agree.
[F]ailure to comply with DSS treatment plans is not one of the statutory grounds for termination of parental rights in this state.  S.C. Dept of Soc. Servs. v. Lail, 335 S.C. 284, 294, 516 S.E.2d 463, 468 (Ct. App. 1999) overruled on other grounds by Joiner v. Rivas, 342 S.C. 102, 109, 536 S.E.2d 372, 375 (2000) (overruling prior cases calling for strict construction of the TPR statutes).  Instead, the TPR statute allows for termination if the parent has not remedied the conditions which caused the removal within six months following the adoption of a placement plan.  S.C. Code Ann. § 20-7-1572(2) (Supp. 2004).
The family court found Cody was removed from Pamelas custody because he faced a substantial risk of harm.  The court found this substantial risk was a complete lack of stability existing in the King family at the time of removal.  The court specifically commented on the transient nature of the King family.  However, at the time of the hearing, Pamela had stable living arrangements in her mother and stepfathers home and stable employment.  Thus, we find the conditions that caused the removal have changed for the better.
Furthermore, the guardian ad litem testified that Pamela had completed the requirements of the placement plan.  Pamelas actions demonstrate substantial compliance with her placement plan.  A final order dated March 17, 2000, required Pamela to complete substance abuse counseling, counseling with the Lowcountry Childrens Center, and other counseling that is not specifically defined.  A May 17, 2000 order required Pamela to complete substance abuse counseling, undergo a psychological evaluation, and anger management or criminal domestic abuse violence intervention.  A September 1, 2000 order required parental effectiveness training, substance abuse counseling, and undefined counseling.  
Pamela completed substance abuse counseling on April 10, 2002 and Systematic Training for Effective Parenting on September 13, 2000, and received a Diploma in Relationship Issues from the Family Violence Treatment Center on February 20, 2001.  In April of 2000 she went to Coastal Empire Mental Health for counseling, but she told her counselor that everything was fine in her life and she did not want mental health services.  Her counselor interpreted this as a refusal of services.  However, Pamela later returned in February of 2001 to Coastal Empire Mental Health and continued in some sort of counseling until June 2001.  We find Pamela did substantially complete all of the requirements ordered by the court.
This finding is supported by the very actions and testimony of DSS.  DSS returned Codys brother and sister  to Pamela, even though one is autistic.  This would suggest that DSS considered her as having completed the requirements of the placement plan and having remedied the instability that had caused the childrens removal.  It is also supported by the actual testimony of her DSS caseworker.  Louvette Green testified that Pamela was in compliance.  However, Green then proceeded to recant and say Pamela did not finish her counseling.  While Mr. Kavolanchik from Coastal Empire Mental Counseling stated Pamela dropped out of counseling after six months, the actual duration of counseling ordered by the court was unspecified and we cannot find that Pamela was not in substantial compliance.  See generally Lail, 335 S.C. at 294, 516 S.E.2d at 468 (Thus, while the mothers efforts to comply fully with DSS treatment plans were less than whole-hearted, the mothers attitude toward DSS is understandable given the chain of events that precipitated the dissolution of the Lail family. Such an attitude, without more, does not mandate the solution sought by DSS in this case.).  Thus we find termination on the grounds of non-compliance was in error.  
3.     Foster care of fifteen of the most recent twenty-two months
In a fairly recent amendment, the TPR statute provides as a ground for termination:  The child has been in foster care under the responsibility of the State for fifteen of the most recent twenty-two months.  S.C. Code Ann. § 20-7-1572(8) (Supp. 2004).  There is no question Cody has been in foster care under the responsibility of the state since October of 1999.  Thus, we find no error in the family courts finding that this ground has been established.  However, we reiterate that this is the only ground DSS established by clear and convincing evidence to support termination of Pamelas rights to Cody.  
4.      Best interests of the child
Although we find one ground for termination does exist, we must also determine whether termination would be in Codys best interests.  We find it is not.  
Our legislature has provided, The interests of the child shall prevail if the childs interest and the parental rights conflict.  S.C. Code Ann. § 20-7-1578 (Supp. 2004).  However it is still [t]he public policy of this state in child custody matters is to reunite parents and children. Hooper v. Rockwell, 334 S.C. 281, 296, 513 S.E.2d 358, 366 (1999); S.C. Code Ann. § 20-7-20 (1985).  The supreme court has recognized a childs shared interest in preventing an erroneous termination of her familial bond with her natural parent.  Greenville County Dept Soc. Servs. v. Bowes, 313 S.C. 188, 196, 437 S.E.2d 107, 111 (1993).  Furthermore, while there is a presumption that it is in the best interest of a child to be in the custody of its biological parent, such a presumption is rebuttable.  Shake v. Darlington County Dept of Soc. Servs., 306 S.C. 216, 222, 410 S.E.2d 923, 926 (Ct. App. 1991) (citing  Moore v. Moore, 300 S.C. 75, 79, 386 S.E.2d 456, 458 (1989)). 
The family court found it would be in the best interests of Cody for Pamelas parental rights to be terminated.  This was partially based on the fact it was undisputed that the child is safe and well cared-for by the [Kendles] and is emotionally attached to [them].  The court refused to apply the factors set forth in Moore v. Moore, 300 S.C. 75, 386 S.E.2d 456 (1989). 
The Moore factors are to be used when a natural parent seeks to reclaim custody of [her] child.  Id. at 79, 386 S.E.2d at 458.  These factors require the court to consider the following:  (1) whether the parent can prove he or she is a fit parent, able to properly care for the child and provide a good home; (2) the amount of contact, in the form of visits, financial support or both, which the parent had with the child while in the care of a third party; (3) the circumstances under which temporary relinquishment occurred; and (4) the degree of attachment between the child and the temporary custodian.  Id.  at 79-80, 386 S.E.2d at 458.  
The family court refused to consider these criteria because Moore involved a private custody action, voluntary relinquishment, and the application of a rebuttable presumption that it is in the best interest of a child to be in the custody of its biological parent.  However, we find application of the Moore factors is not limited to voluntary relinquishment cases.  This court applied the Moore factors in Shake v. Darlington County Dept of Soc. Serv., 306 S.C. 216, 410 S.E.2d 923 (Ct. App. 1991).  In Shake, the natural parents voluntarily relinquished custody of the child when he was a month old due to the childs failure to thrive.   At that time he was placed in the care of the foster mother.  When the child was five months old, he was returned to his natural parents, but a month later, DSS sought and procured an emergency protective custody order at which time he was placed back in the care of the foster mother.  Up until the time of the hearing on this matter four years later, the child had remained in the continuous care of the foster mother.  The foster mother brought the action seeking termination of natural parents rights to the child.  The family court denied the termination and granted custody to the natural mother.  On appeal, this court affirmed the denial of termination of parental rights, but applied the Moore factors to hold custody should be returned to the foster mother.  Similarly, the supreme court applied the Moore factors in an action to terminate a fathers parental rights brought by a childs guardian ad litem following removal of the child from the natural mother and placement of the child with foster parents who wanted to adopt him.  Hopkins v. S.C. Dept of Soc. Serv., 313 S.C. 322, 437 S.E.2d 542 (1993) overruled on other grounds by Joiner v. Rivas, 342 S.C. 102, 109, 536 S.E.2d 372, 375 (2000) (overruling prior cases calling for strict construction of the TPR statutes).  Thus, the appellate courts have applied the Moore factors in cases involving DSS removal of children.  Furthermore, the Kendle family has intervened in this case as the pre-adoptive foster family, similar to the foster mothers initiation of the action in Shake.  Accordingly, we will consider the Moore factors as guidance in determining whether termination of Pamelas parental rights is in Codys best interest.    
  Pamelas fitness as a parent cannot be questioned.  She has improved her life and provided a stable family environment for Codys brother and sister.  For DSS to argue Pamela is an unfit parent would require it to argue that it improperly returned the two children to her.  Furthermore, Louvette Green agreed that [w]hat [this case] boils down to is Cody, himself, and only Cody, has become attached to the Kendles and that is the issue DSS is having before the court today.  
Second, Pamela has had continuous contact with Cody.  Although DSS limited her to one hour a month with her son, Pamela took advantage of every visitation offered and begged for more time with him.    See generally Greenville County Dept of Soc. Servs. v. Bowes, 313 S.C. 188, 195, 437 S.E.2d 107, 111 (1993) (noting that the State marshals an array of public resources and has the power to shape the historical events that from the basis of termination and that DSS had contributed to the lack of bonding between Mother and her child.).  Furthermore, Pamela has provided some financial support.  
For the third factor, custody was relinquished because the instability in Pamelas life posed a threat of harm to the children.  However, she has altered her lifestyle and it no longer presents an obstacle in this case.  
As to the final factor, there is no question that Cody is thriving in the Kendles home.  However, Dr. Ralston could not state if Cody had bonded or was simply employing a survival technique.  
Furthermore, testimony demonstrates Cody is a resilient child who has a relationship with Pamela, his brother and sister, and grandparents.  If returned to Pamela, Cody would not only have the love, support, and care of his natural mother, but also of these other family members.  Pamela testified that Codys brother and sister miss him and write him letters, which they cannot send.  Buck testified that during visitations Cody and his brother and sister played together and were very close.
In this case, our focus centers on what is in the best interests for Cody.  We are concerned by the length of time Pamela took in completing her treatment plan while her children remained in DSS custody.  However, it was after Pamela had turned her life around and rededicated herself to completing her treatment plan that DSS took action to place Cody with preadoptive parents.  Although Pamela had not had a positive drug test since June of 2001 and was enrolled in a substance abuse and counseling program that would fulfill the requirements of her plan, DSS placed Cody with the Kendles in October of 2001.  Only six months after Cody was placed with the Kendles, the Foster Care Review Board changed its recommendation from termination of parental rights to reunification with Pamela within six months.  Despite this recommendation, DSS continued to pursue termination while Cody remained with the Kendles in a preadoptive placement.  There is no question that, at the very latest, when Codys brother and sister were returned to her, Pamela was a fit parent capable of caring for Cody.  

 Keeping the best interest of Cody as our paramount concern, we conclude that Codys interests would be served best by denying termination of parental rights. 
 CONCLUSION
 

For the reasons discussed above, we find the family court erred in terminating the parental rights of Pamela King to her son Cody King. 
REVERSED.
HUFF, KITTREDGE, and BEATTY, JJ., concur. 

[1] Casey was born June 17, 1990, Ashley was born November 17, 1994, and Cody was born March 24, 1997.  
[2] In September 2001, Pamela entered drug court as a result of criminal charges that arose from her employment when she lived in Hardeeville.
[3] Although the Kendles filed their motion to intervene under the pseudonyms John Roe and Mary Roe, they used their real names at the hearing.