631 S.E.2d 239

CHARLESTON COUNTY DEPARTMENT OF
SOCIAL SERVICES and John Roe and
Mary Roe, Intervenors, Petitioners,

v.

Pamela KING, Kenneth King, Jr., and Cody King,
a child, D/O/B–03/24/97, Defendants,

of whom Pamela King is, Respondent.

No. 26152.

Supreme Court of South Carolina.

Heard Jan. 31, 2006.

Decided May 22, 2006.

Rehearing Denied July 7, 2006.

R. Glenn Lister, Jr., and Daphne A. Burns, of Mt. Pleasant; and Frampton Durban, Jr., of Charleston County Department of Social Services, of North Charleston, for petitioners.

Robert V. DeMarco, of Charleston, for respondent.

Ruth F. Buck, of Sullivans Island, for Amicus Curiae.

Ellen Babb, of Mt. Pleasant, for Guardian Ad Litem.

Justice MOORE:

This petition arises out of a dispute over the termination of parental rights of a biological mother as to her youngest child. The family court found the grounds were met for terminating the mother's parental rights and that doing so was in the best interests of the child. The Court of Appeals reversed, upholding one ground for termination but finding the best interests of the child would be served by preserving the biological mother's parental rights. *Charleston County Dep't of Soc. Servs. v. King,* Op. No.2005–UP–155 (S.C. Ct.App. filed March 4, 2005).[1]

---

1. Kenneth King, the biological father of the child, did not appeal the termination of his parental rights.

Petitioners, Charleston County Department of Social Services (DSS) and the pre-adoptive parents of the child (the Kendles),[2] appeal the decision of the Court of Appeals. We reverse.

## FACTS

Respondent, Pamela King (King), and her husband, Kenneth King, were arrested in October 1999, after attempting to pass a fraudulent check. The couple and their three children were traveling through South Carolina from Pennsylvania and were moving to Texas to live near King's family. The couple was arrested for obtaining goods under false pretenses. Upon further inspection by police, a crack pipe was found in King's purse.[3] The couple was placed in jail and DSS took the children into emergency protective custody. At the time of removal, Casey was nine, Ashley was five, and Cody was two years old.

A treatment plan was presented to the family court in January 2000 and finalized as of July 2000. The plan directed King to undergo a psychological evaluation, complete parenting classes, complete various forms of counseling, and pay child support.

In February 2000, King and her husband moved from Charleston County to Jasper County. King completed parenting classes in September 2000. King attended counseling sessions, but then ceased to attend in April 2000. She later attended more counseling sessions for approximately five months. She paid six months of child support before her payments became sporadic.

King testified that, although she had never used drugs before, she began to use cocaine in October 2000. She twice tested positive for cocaine in February and June 2001. King testified she used cocaine two to three times a week from October 2000 to June 2001. Meanwhile, in February 2001, King left her husband and moved in with her mother and

---

**2.** Although the Kendles filed their motion to intervene under the pseudonyms John Roe and Mary Roe, they used their real names at the hearing.

**3.** The charge regarding the crack pipe was dismissed.

stepfather in Smoaks, South Carolina.[4] She resided there for approximately two years before the termination of parental rights (TPR) hearing and apparently continues to reside there with the two children who were returned to her. At the time of the TPR hearing, King was in divorce proceedings with her estranged husband. Throughout the time the children were in protective custody, King visited the children.

The Foster Care Review Board recommended terminating King's parental rights in October 2000. Because King had not fully complied with her treatment plan, the family court adopted a permanence plan of terminating King's parental rights as to all of her children in March 2001. The TPR action was filed in May 2001.

King, in the meantime, began to accomplish the goals set out in the treatment plan. She entered substance abuse treatment, which included family counseling, through a Drug Court program following her September 2001 arrest for breach of trust. She completed her substance abuse treatment in September 2002 and had completed all the requirements set out in the treatment plan except for paying child support, for which she was briefly imprisoned in March 2002. She completed the anger management and domestic abuse counseling in March 2001 and the psychological evaluation in June 2001. As a result, in April 2002, the Foster Care Review Board and the former guardian ad litem (GAL), Ruth Buck, changed their recommendations from termination of parental rights to reunification. DSS looked at each child's individual best interest and returned Ashley and Casey, an autistic child, to King in November 2002. DSS did not return Cody to King. The DSS caseworker testified it was in Ashley's and Casey's best interests to be returned to King, but it was not in Cody's best interest to be returned to King.

As for the children, they were placed in separate foster homes after being removed from their parents. Cody was placed with the Shanklin family for two years but was removed in September 2001.[5] He was then placed in two short-

4. King's mother and step-father moved to South Carolina to assist their daughter in regaining her children.

5. When Cody arrived at the Shanklin home, he was underweight, scared, cried for his brother, and had food issues. He allegedly would

term households before being placed in the pre-adoptive home of Kurtis and Gayle Kendle in October 2001. When the Kendles took Cody in, the DSS caseworker informed them they could call him "Cody Kendle" and gave them a Medicaid card with the name "Cody Kendle." The caseworker also informed them they could raise him as their own son and represent themselves as his parents. The caseworker stated that such actions are standard practice for adoptive placements. She testified she informed the Kendles that Cody was a high-risk adoption.

When he was removed from the Kings, Cody was diagnosed with psychosocial dwarfism or psychosocial failure to thrive, an environmentally-induced condition that occurs when a child is not receiving appropriate nurturing behaviors from a parent.

DSS withdrew its action to terminate King's parental rights as to the older two children but continued with the action to terminate her rights as to Cody. After a hearing, the family court judge terminated King's parental rights pursuant to three statutory grounds. See S.C.Code Ann. 20–7–1572(2), (4), and (8) (Supp.2005). First, the court found King had failed to remedy the condition which caused the removal within six months following the adoption of the placement plan. The family court judge also found King had failed to support her child by not paying child support in excess of six months. Additionally, the family court found Cody had been in foster care for fifteen of the most recent twenty-two months.

As for Cody's best interests, the family court found his best interests were served by terminating King's parental rights. The court noted that, at that time, Cody had spent over half his life in foster care and was thriving with the Kendles. The court found the evidence showed Cody did not have an accurate perception of his birth mother or siblings. He viewed his siblings only as two children with whom he visits and King as Casey and Ashley's mother. The court also noted the overwhelming evidence that Cody had "bonded" with the Kendles and referred to the Kendles as mom and dad. The court

---

eat until he made himself sick, hide food, and pick up objects and smell them to see if he could eat them. Cody was removed from the Shanklin home when the Shanklins separated.

distinguished Cody's situation from that of his siblings because, due to Cody's young age, he had essentially no memory of his biological family.

The Court of Appeals reversed, finding only one of the grounds for termination existed, and that Cody's best interests would be served by preserving King's parental rights. The Court of Appeals found DSS had proved only one ground for TPR which was that Cody had been in foster care fifteen out of the most recent twenty-two months. The Court of Appeals found it was in Cody's best interests to return to King and his siblings. In finding for King, the Court of Appeals relied on the *Moore* factors (to be discussed *infra*), and determined that Cody's best interests would be served by denying the termination of King's parental rights.

The Court of Appeals' decision upholding the family court's ruling that Cody had been in foster care fifteen out of the most recent twenty-two months at the time of the hearing was not appealed. Because one statutory ground for TPR has been met, the only issue remaining for us to consider is whether termination is in the best interest of the child. *See* S.C.Code Ann. 20–7–1572 (Supp.2005) (family court may terminate parental rights if it finds at least one of the nine statutory grounds for termination has been met and that termination is in the best interest of the child).

## ISSUES

I. Did the Court of Appeals err by applying the *Moore v. Moore*[6] criteria to a determination of the best interests of the child in a termination of parental rights case?

II. Did the Court of Appeals err by ruling that the best interests of the child required the parental rights of the mother to be preserved?

## DISCUSSION

### I

Petitioners argue the Court of Appeals erred by applying the *Moore* factors to a determination of the best interests of the child in a termination of parental rights case. We agree.

---

6. 300 S.C. 75, 386 S.E.2d 456 (1989).

The *Moore* case involved a child custody dispute between a natural father and the family that offered to take care of one of his five children. The natural father accepted the family's offer of taking care of the child, but continued to visit the child regularly. Eventually, when the family refused to allow the father to visit with the child except in their home, the father commenced a suit requiring the family to show cause why he should not be allowed to remove the child from their home.

In *Moore*, we stated the dilemma is how to assure that parents who temporarily relinquish custody for their child's best interests can regain custody when conditions become more favorable. To address this dilemma, we stated the following factors should be considered in making custody determinations when a natural parent seeks to reclaim custody of his child: (1) the parent must prove that he or she is a fit parent, able to properly care for the child and provide a good home; (2) the amount of contact, in the form of visits, financial support or both, which the parent had with the child while the child was in the care of a third party; (3) the circumstances under which temporary relinquishment occurred; (4) the degree of attachment between the child and the temporary custodian. After applying the criteria, we determined the natural father should be awarded custody of the child.

Petitioners argue the *Moore* factors were established to determine the best interests of a child in a custody dispute involving voluntary relinquishment of custody, not in a termination of parental rights action. Petitioners are correct.

The *Moore* factors have been used in actions seeking to regain custody after a voluntary relinquishment. *See, e.g., Malpass v. Hodson*, 309 S.C. 397, 424 S.E.2d 470 (1992) (factors used in case where mother sought to regain custody after voluntarily relinquishing custody to maternal grandparents while in abusive relationship); *Dodge v. Dodge*, 332 S.C. 401, 505 S.E.2d 344 (Ct.App.1998) (factors used in case where father sought to regain custody after voluntarily relinquishing custody to grandparents).

We have used the *Moore* factors in one termination of parental rights case. *Hopkins v. South Carolina Dep't of Soc. Servs.*, 313 S.C. 322, 437 S.E.2d 542 (1993), *overruled on other grounds by Joiner ex rel Rivas v. Rivas*, 342 S.C. 102, 536

S.E.2d 372 (2000). However, this case is distinguishable. Although a TPR action was involved, the target of that action was an innocent natural father who had attempted to establish his paternity of the child but could not because the mother continually disappeared with the child and later, without the father's knowledge, subjected the child to abuse and neglect. While the child had not been voluntarily relinquished by the father as envisioned by the *Moore* case, DSS removed the child from the mother before the father was given a chance to establish his paternity; therefore, it was an action involving an innocent parent attempting to gain custody of his child from a third party. Therefore, *Hopkins,* does not stand for the proposition that the *Moore* factors should be used when determining the best interests of a child in a termination of parental rights case.

The Court of Appeals has also mentioned the *Moore* factors in a TPR case. In *Shake,* the parents of Michael voluntarily relinquished custody of him to the Department of Social Services (DSS) because he had been diagnosed with failure to thrive. *Shake v. Darlington County Dep't of Soc. Servs.,* 306 S.C. 216, 410 S.E.2d 923 (Ct.App.1991). DSS placed Michael with Shake and Shake later moved to terminate the parental rights of the parents and for custody of Michael regardless of termination of parental rights. The court found DSS and Shake had failed to establish grounds sufficient to meet the standard required to terminate parental rights. Therefore, the court found the mother's parental rights should not be terminated and did not reach the issue of whether the best interests of the child required that the mother's parental rights be terminated.

However, Shake further argued that even if parental rights were not terminated, it was in Michael's best interest to remain in her custody. The court utilized the *Moore* factors and determined that Michael's best interests required that he be placed in Shake's custody. The Court of Appeals, therefore, did not apply the *Moore* factors to the termination of parental rights portion of the case but only to the custody portion of the case.

Accordingly, the Court of Appeals erred by applying the *Moore* factors to the instant action. The *Moore* factors apply

where a natural parent, who has voluntarily relinquished custody of his child, seeks to reclaim custody from a third party. The *Moore* factors cannot apply in the termination of parental rights situation because that situation is governed by statute. *See* S.C.Code Ann. §§ 20–7–1560 to –1582 (Supp. 2005).

## II

Petitioners argue that because Cody has bonded with the Kendles, is thriving in their home, and has no memory of his biological mother and siblings, his best interests require that King's parental rights be terminated.

Both parties questioned the experts presented at trial regarding Cody's best interests. Dr. Elizabeth Ralston, a clinical psychologist, testified she had observed Cody and the Kendles, and King and her other children. Dr. Ralston testified Cody had no verbal memory of his natural parents and did not identify King as his mother or Ashley and Casey as his siblings. Instead, she testified Cody identifies King as "Ashley and Casey's mother" and his siblings as "a boy and a girl, and as brother and sister." In Dr. Ralston's opinion, Cody has blossomed in the Kendles' care and no longer shows any symptoms of psychosocial dwarfism. On cross, Dr. Ralston testified Cody's removal from the Kendles might be mitigated by the fact that he was being returned to his natural mother and siblings if he had any memory of those people in that capacity. However, she testified Cody does not have that memory.

Dr. Charles Barton Saylor, a forensic psychologist, testified Cody did not express any recollection of his natural parents and did not have a real concept of his natural family. He testified Cody thinks of Mrs. Kendle, not King, as his mother. Dr. Saylor testified Cody's best interests would be served by allowing him to remain with the Kendles and have closure.

The DSS caseworker testified Cody is happy, bonded, and attached to the Kendles and has no real attachment to his mother during visits and that he mostly plays with his siblings during those visits.

One of the adoption specialists testified that Cody believes the Kendles' home is his home and that he is comfortable

there. She felt his best interests required that he remain with the Kendles.

The Kendles testified that Cody calls them mom and dad and is very affectionate towards them. Mrs. Kendle, at the time of the hearing, was a stay-at-home mother and Mr. Kendle was a homebuilder working at an office inside the home.

The former GAL, Ruth Buck, testified Cody does not know King as his natural mother because he was too young when he was removed. Buck stated she changed her position regarding TPR because King never missed a visit with Cody and she saw an improvement in Cody's relationship with her once the estranged husband stopped visiting. She further changed her position because King made substantial progress on her treatment plan. She admitted that Cody has bonded with the Kendles and calls them mom and dad and that Cody has a nice home to live in with a private room. Buck testified that because King has been deemed to be a fit enough mother to take care of her special needs child, she is very able to accept Cody back into the family. Buck recommended that Cody be returned to King.

■ When reviewing the family court decision, appellate courts may make their own conclusions of whether DSS proved by clear and convincing evidence that parental rights should be terminated. *South Carolina Dep't of Soc. Servs. v. Cochran*, 364 S.C. 621, 614 S.E.2d 642 (2005). We have stated: "The termination of the legal relationship between natural parents and a child presents one [of] the most difficult issues this Court is called upon to decide. We exercise great caution in reviewing termination proceedings and will conclude termination is proper only when the evidence clearly and convincingly mandates such a result." *Id.* at 626, 614 S.E.2d at 645.

Our General Assembly has mandated that when the interest of the child and the parental rights conflict, the interest of the child shall prevail. S.C.Code Ann. § 20–7–1578 (Supp.2005). *See also South Carolina Dep't of Soc. Servs. v. Cochran, supra* (in balancing the interests of the child and the mother, the best interest of the child is paramount to that of the parent).

■ At the time of the family court hearing, Cody had been out of King's care for almost three and one-half years and had been with the Kendles for almost one and a half years. By the time King had completed her treatment plan, Cody was in a loving, stable environment with the Kendles and had no memory of his biological family. As the experts at trial testified, Cody did not realize King was his natural mother and he identified the Kendles as his parents. To remove Cody from the Kendles clearly would be very traumatic for him. We find the family court correctly determined that the best interests of Cody were that his mother's parental rights be terminated and that he remain with the Kendles. *See* § 20–7–1578 (if the child's interest and the parental rights conflict, the interest of the child shall prevail). Accordingly, the decision of the Court of Appeals is

**REVERSED.**

TOAL, C.J., BURNETT, PLEICONES, JJ., and Acting Justice HOWARD P. KING, concur.