741 S.E.2d 739

SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Petitioner,

v.

SARAH W. and Vaughn S., Defendants,

Of Whom Sarah W. is the Respondent.

In the Interest of two minor children under the age of 18.

Appellate Case No. 2012–208546.

No. 27235.

Supreme Court of South Carolina.

Heard July 11, 2012.
Decided March 20, 2013.
Rehearing Denied May 15, 2013

326

Robin Chandler of Lexington, for Petitioner.

Franklin Grady Shuler, Jr., of Turner Padget Graham & Laney, P.A. of Columbia, for Respondent.

## ON WRIT OF CERTIORARI TO
## THE COURT OF APPEALS

Chief Justice TOAL.

In this appeal from the reversal of an order terminating a biological mother's parental rights, we reverse the court of appeals and hold that the family court properly terminated the biological mother's parental rights pursuant to section 63–7–2570(8) of the South Carolina Code.

## FACTUAL/PROCEDURAL BACKGROUND

Sarah W. (Mother) is the biological mother of a minor boy and a minor girl (Boy and Girl) (collectively the children). In 2007, Mother and the children's father, Vaughn S. (Father) (collectively Defendants), and the children resided in a home without heat, electricity, or running water. In August of that year, Mother arranged for her brother and sister-in-law, Thomas W. and Brittney W., to take primary responsibility for the children. On October 4, 2007, the South Carolina Department of Social Services (DSS) requested that the family court issue an ex parte order granting DSS emergency protective custody of Boy. DSS alleged it had probable cause to believe that Boy faced imminent and substantial danger to his health or physical safety. The family court agreed, basing its determination on the fact that Defendants were "unable to provided [sic] even marginally suitable housing" for Boy, and finding that Thomas W. and Brittney W. "apparently abused a sibling" of Boy. The family court awarded emergency protective custody to DSS. On October 5, 2007, the family court held a probable cause hearing and found sufficient probable cause to warrant issuance of the ex parte order. At this same hearing, the family court found that Thomas W. and Brittney W. were no longer willing to maintain custody of Girl, and the court ordered DSS to take emergency protective custody of Girl.

The family court ordered a merits hearing for November 15, 2007. However, Defendants requested a continuance due to their attorney's conflict. The family court noted that DSS was prepared to proceed and rescheduled the hearing for December 20, 2007. The hearing commenced as scheduled, and the family court concluded that Defendants "failed to provide adequate and safe housing for [the children]," and DSS should be awarded custody of the children. Additionally, the family court approved a Placement Plan (the Plan), agreed to by all parties, which set out requirements that Defendants would need to satisfy in order to regain custody of the children. Under the terms of the Plan, Mother was required, among other things, to seek and maintain adequate employment and appropriate housing and space for the children. The Plan also required Defendants to submit to a mental health evaluation and follow the recommendations of that evaluation. The family court ordered a review hearing for June 12, 2008. At that review hearing, the parties agreed that Defendants had not completed the requirements of the Plan, but that additional time should be allotted for completion. The family court ordered that the conditions of the Plan should continue until September 18, 2008.

On September 4, 2008, DSS issued a Supplemental Report recommending reunification of Defendants and the children. The Report noted that Mother had maintained adequate employment and housing. Additionally, Defendants completed mental evaluations, and no mental health services had been recommended.

On September 30, 2008, the family court held a Permanency Planning Hearing. At this hearing, DSS informed the family court that its September 2008 Supplemental Report addressing the conditions giving rise to Boy and Girl's removal failed to address issues that arose following the children's placement in state custody. Specifically, DSS discovered a court order from January 18, 1994, from Edgefield County, wherein the court found that Father "more likely than not" sexually abused a biological daughter not party to the present action. Additionally, DSS alleged that Girl made statements during a forensic interview that raised the issue of possible alcohol and drug abuse by Defendants. DSS sought to incorporate a plan

as to how to protect Boy and Girl as a result of these findings, and sought additional relief, which would require:

(1) that any and all visitation between Father and children be strictly supervised by an adult;

(2) Mother to submit to random drug tests, and a drug and alcohol assessment;

(3) Mother attend and successfully complete a parenting skills class.

The family court rejected the requested relief and ordered a six-month extension of the Placement Plan for the purpose of reunification, and a completion of a thorough investigation of the unaddressed issues.

On January 23, 2009, DSS issued a second Supplemental Report. The Report recommended termination of Defendants' parental rights and adoption as a permanent plan for the children. Despite the fact that Mother obtained adequate employment and housing, DSS stated that her alleged drug use necessitated continued foster care of the children:

Although [Mother] successfully completed a mental health assessment and no services were needed and obtained adequate employment and housing with space available for 2 children, a Permanency Planning Hearing was held on September 18, 2008 ordering Mother to undergo an alcohol and drug assessment. On December 3, 2008 Saluda County DSS transported [Mother] . . . for an alcohol and drug assessment. [Mother] tested positive for cocaine and marijuana, she denies any drug use and refuse [sic] to comply with treatment services offered . . ., however, her file was unsuccessfully closed as of December 23, 2008 due to her lack of attendance.

The report also noted Father's inability to meet the demands of the Plan:

[Father] . . . has not obtained adequate housing nor has he demonstrated the ability to economically provide for all the needs of the minor children.

On February 19, 2009, the family court held a Permanency Planning Hearing and DSS presented results and findings from its further investigation of the unaddressed issues from the September 30, 2008 hearing. DSS verified that Father

agreed to a court finding that he more likely than not molested his daughter. Moreover, although this order was included in the Statewide Central Registry, DSS previously failed to discover the court order due to an existing law which provided for the purging of the registry following a certain period of time. DSS concluded that because of this molestation issue and Father's unemployment and homelessness, termination of his parental rights with regard to Boy and Girl would be in the children's best interest.

DSS also presented the results of Mother's drug and alcohol assessment from the Supplemental Report, and verified her positive test, refusal to attend group sessions and denial of drug use. DSS argued supportable grounds for termination of parental rights (TPR) existed and termination would serve the best interests of the children. The family court agreed, and issued an order on February 19, 2009, directing severance of parental rights:

> The children have continuously been in foster care since October 5, 2007, a period of sixteen months. S.C.Code Ann. § 20–7–766(F)(Supp.2007) makes it clear that a reasonable time for reunification is not to exceed eighteen (18) months. Indeed there is no statutory provision for extending the time for reunification based upon issues that may arise after the children are taken into care. In this case, the issue of drug use by [Mother] arose because of her conduct; her unwillingness to address that issue has resulted in an expiration of the time this [c]ourt will afford her to demonstrate that she can provide for these minors. The need for permanency for these children will not abide further delays in obtaining that permanency.
>
> . . . .
>
> DSS shall commence a termination of parental rights proceeding against Defendants within sixty (60) days of the filing of this Order.... The next permanency planning hearing shall be held within one (1) year of the date of this hearing.

Despite this finding, at the termination of parental rights hearing, the family court found that the evidence supported Defendants' claim that DSS failed to provide services to assist them in meeting their goals:

The parental rights of Defendants ... should not be terminated because it is not in the best interest[s] of the children to do so at this time. Defendant's claim that Plaintiff was dilatory and mishandled this case which resulted in the extended time in which the children have been in Plaintiff's custody. It is undeniable that had the Plaintiff uncovered subsequently discovered concerns sooner, [Defendants] would have been afforded more time to adequately address those concerns and more importantly, to consider the consequences of failing to address those concerns.

Additionally, the family court noted that, in September 2008, DSS appeared ready to return the children to the custody of Mother, and "while there were good and justifiable reasons for the [c]ourt's refusal to do so, it does not appear that [DSS] has provided sufficient time and guidance and services in remedying those concerns." The family court then mandated the continued placement of the children with DSS and ordered the parties to agree on a Placement Plan designed to effectuate the reunification of Defendants and the children. The family court required that the Plan include at least a psychological evaluation and random alcohol and drug tests for Defendants, parenting skills classes, closely monitored visitation, and resolution of issues regarding Defendants' ability to provide for the ongoing basic needs of the children to include maintenance of adequate employment and transportation. The family court also took care to warn Defendants of the importance of timely and successful completion of the Plan's objectives:

Pursuant to S.C.Code Ann. § 63–7–1680(E) Defendants are generally advised that failure to substantially accomplish the objectives stated in the Placement Plan within the specified time frames provided may result in termination of parental rights.... However, in light of the extensive time that the minors have been in foster care, time of [sic] the essence as for Defendants and that the requirements of this plan must be successfully, fully, and entirely completed prior to the review date, which will be March 4, 2010 at 3:00 P.M. or the Court will direct [DSS] to proceed with another termination of parental rights hearing.

On April 20, 2010, the family court held another Permanency Planning Hearing, and reviewed the conduct of the parties pursuant to the Plan adopted at the August 27, 2009 hearing. The court's order relied rather substantially on the testimony

of the Saluda County DSS worker assigned to the case. That worker testified in pertinent part, that:

(1) DSS recommended TPR based primarily on psychological evaluations, drug test results, and concerns regarding Mother's ability to adequately provide for the children's needs.

(2) On January 12, 2010, Father tested positive for cocaine. However, Father denied the use of drugs. Due to Father's positive test and prior issues related to child molestation, DSS did not recommend return of the children to a household in which he resided. However, Mother could not adequately support the children without assistance from Father, and could not assert herself against him in order to protect the best interest of the children.

(3) Defendants completed certain items of the Plan, including visitation, parenting and anger management classes, the maintenance of adequate shelter, and the preparation of a financial budget. However, Defendants' limited income and budget failed to provide for all of the children's necessary expenses.

(4) Despite a medical recommendation of short term psychotherapy for Mother's anxiety issues, DSS had been unable to assist with such services.

The Guardian ad Litem (GAL) testified and also recommended TPR. The GAL expressed concern that Defendants denied drug use during the periods they tested positive, and that their home had a strong odor of second-hand smoke.

Thus, the family court approved TPR and adoption as the children's permanency plan. According to the family court, the best interests of the children would not be served by return to Defendants and DSS made reasonable and timely efforts to make and finalize a permanent plan for the children. The court summarized the myriad issues working to prevent reunification of the family unit:

Both Defendants, at times, have taken initiative and made progress, but neither has placed himself or herself in a position to be awarded custody of the children at the time of this hearing. They now find themselves in somewhat of a Catch–22 situation living in the [F]ather's home, especially in light of [Father's] continued drug use and [Mother's]

financial limitations and inability to provide for the children on her own. The parties have never married, and [Father] has not offered to move out of his own home. Any financial aid available to [Mother] would be in the form of assistance, not a substitute for her parental obligations, and would not meet the basic needs of the children even in combination with her limited income.

On January 27, 2011, the family court commenced a TPR hearing. The family court found that the facts of the case presented grounds for TPR pursuant to section 63–7–2570(8), and addressed directly the delay in processing the case:

Nowhere in the above is there substantial evidence that the delay in the processing of this case is attributable to the acts of others, unless the various Family Court Judges that have heard this matter constitute others, a proposition this [c]ourt will not accept.

The family court noted many of the issues addressed in the prior review hearing, placing special emphasis on the special needs of the children, and the parent's inability to provide for these needs. Thus, the court found TPR in the best interests of the children, and approved adoption as the plan for permanency.

Mother appealed the family court's TPR order. On November 29, 2011, the court of appeals reversed in an unpublished opinion pursuant to Rule 268(d)(2), SCACR. DSS petitioned this Court for review, and we granted that petition.

## ISSUES PRESENTED

I. Whether section 63–7–2570(8) of the South Carolina Code is unconstitutional when it is the only basis for the termination of parental rights.

II. Whether the court of appeals erred in reversing the family court's finding that DSS proved by clear and convincing evidence that termination was in the children's best interest where the children had been in foster care for fifteen of the most recent twenty-two months.

## STANDARD OF REVIEW

In reviewing the decision of the family court, an appellate court has the authority to find the facts in accor-

dance with its own view of the preponderance of the evidence. *Lewis v. Lewis*, 392 S.C. 381, 384, 709 S.E.2d 650, 651 (2011). While this Court retains its authority to make its own findings of fact, we recognize the superior position of the family court in making credibility determinations. *Id.* at 392, 709 S.E.2d at 655. In addition, "consistent with our constitutional authority for de novo review, an appellant is not relieved of his burden to demonstrate error in the family court's findings of fact." *Id.* Thus, "the family court's factual findings will be affirmed unless 'appellant satisfies this Court that the preponderance of the evidence is against the finding of the [family] court.'" *Id.* (citations omitted).

## LAW/ANALYSIS

### I. The constitutionality of section 63–7–2570(8) of the South Carolina Code.

█ Mother challenges the constitutionality of section 63–7–2570(8), and claims in her brief that in order to reverse the court of appeals, "this Court must hold as a matter of law, that it is constitutionally permissible to terminate parental rights based on nothing more than the passage of time." We disagree.

█ In deciding the constitutionality of a statute, every presumption will be made in favor of its validity, and no statute will be considered unconstitutional unless its invalidity leaves no doubt that it conflicts with the constitution. *State v. Gaster*, 349 S.C. 545, 549–50, 564 S.E.2d 87, 89–90 (2002). "This presumption places the initial burden on the party challenging the constitutionality of the legislation to show it violates a provision of the constitution." *State v. White*, 348 S.C. 532, 536–37, 560 S.E.2d 420, 422 (2002).

The family court relied on section 63–7–2570(8) as the sole basis for terminating Mother's parental rights. That section provides in pertinent part:

The family court may order the termination of parental rights upon a finding of one or more of the following grounds and a finding that termination is in the best interest of the child ...

(8) The child has been in foster care under the responsibility of the State for fifteen of the most recent twenty-two months.

S.C.Code Ann. § 63–7–2570(8) (2010).

In *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court recognized that parents have a fundamental liberty interest in the care, custody, and management of their children. This interest does not "evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Id.* ("Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life.") The Supreme Court held that the Due Process Clause of the Fourteenth Amendment[1] prevents a state from completely and irrevocably severing the rights of parents in their natural child unless the state's allegations against those parents can be proven by at least clear and convincing evidence. *Id.* at 747–48, 102 S.Ct. 1388. This Court has long recognized and applied this principle to the termination of parental rights in South Carolina. *Hooper v. Rockwell*, 334 S.C. 281, 296, 513 S.E.2d 358, 366 (1999); *Richland Cnty. Dep't of Soc. Servs. v. Earles*, 330 S.C. 24, 32, 496 S.E.2d 864, 868 (1998); *Greenville Cnty. Dep't of Soc. Servs. v. Bowes*, 313 S.C. 188, 193, 437 S.E.2d 107, 110 (1993), *superseded by statute*, S.C.Code Ann. § 20–7–1572 (Supp. 1997), *as recognized in Hooper*, 334 S.C. at 297 n. 6, 513 S.E.2d at 366 n. 6.

Therefore, when DSS seeks TPR pursuant to section 63–7–2570, the allegations supporting that termination must be proved by clear and convincing evidence. Moreover, it is paramount that termination under those grounds is in the best interests of the child. *See* S.C.Code Ann. § 63–7–2570 ("The family court may order the termination of parental rights upon a finding of one or more of the following grounds *and* a finding that termination is in the best interest of the child.") (emphasis added).

In *Charleston County Department of Social Services v. Marccuci*, 396 S.C. 218, 721 S.E.2d 768 (2011), we decided that parental rights cannot be terminated pursuant to section 63–

---

1. U.S. Const. amend. XIV, § 1.

7–2570(8) merely due to the passage of time, and held that the family court erred in terminating the father's parental rights because his actions did not materially contribute to the delay in reunification:

> Here, there is substantial evidence that this little girl languished unduly in foster care not because of any actions, or inactions, by [father], but because the delays generated and road blocks erected in the removal action made it impossible for the parties to regain legal custody of [minor] prior to the expiration of the fifteen month period. . . . Taking our own view of the evidence, we find that [father] did not sit idly by while his child was in foster care, but rather he was stymied by the system charged with the responsibility of protecting this child. . . . The various continuances requested by other parties were largely the reason the child remained in foster care . . . and under these circumstances, we hold that this ground should not serve as the basis for terminating this father's parental rights.

*Id.* at 227, 721 S.E.2d at 773 (alterations in original).

Thus, section 63–7–2570(8) may not be used to sever parental rights based solely on the fact that the child has spent fifteen of the past twenty-two months in foster care. The family court must find that severance is in the best interests of the child, and that the delay in reunification of the family unit is attributable not to mistakes by the government, but to the parent's inability to provide an environment where the child will be nourished and protected. *See* S.C.Code Ann. § 63–7–2510 (2010) (explaining the purpose behind the South Carolina Code's TPR statute).

In dissent, Justice Beatty argues that these considerations are only relevant within the context of an "as-applied" challenge. We disagree. These considerations are part and parcel of the application of section 63–7–2570(8) and are essential to an analysis of facial constitutionality. This interpretation comports with the General Assembly's intent in creating a robust child protection regime.

The General Assembly sought to establish a mechanism for "reasonable" and "compassionate" TPR only after a child has been "abused, neglected, or abandoned." S.C.Code Ann. § 63–7–2510 (2010). The General Assembly decided that TPR

under these circumstances was necessary in order to make these children eligible for adoption and placement in the type of environment necessary for a "happy, healthful, and productive life." *Id.* It is neither reasonable nor compassionate to permanently sever parental rights based on significant delays and roadblocks erected by the State. Moreover, TPR granted solely on this basis runs counter to a parent's fundamental liberty interest in the care, custody, and management of his or her child. *See Santosky,* 455 U.S. at 753, 102 S.Ct. 1388. In assuming every presumption in favor of the TPR statute's validity, we refuse to find that the General Assembly created a mechanism at conflict with the constitutional rights of parents. Adoption of such a distorted view of section 63–7–2570 would lead to results fundamentally out of step with well-settled constitutional rights, and we must presume that the General Assembly intended no such reading. *Gaster,* 349 S.C. at 549–50, 564 S.E.2d at 89–90. Thus, we hold that section 63–7–2570(8) provides the requisite level of due process to preserve a parent's fundamental rights in a TPR proceeding while at the same time recognizing the State's compelling interest in providing for the health and welfare of children who face abuse, neglect, or abandonment.[2]

The facial constitutionality of section 63–7–2570(8) does not immunize it from challenge under an as-applied theory. Put another way, and consistent with our holding in *Marccuci,* the

---

2. We respectfully disagree with Justice Beatty's assertion that section 63–7–2570(8) is inconsistent with the legislative intent of the federal Adoption and Safe Families Act of 1997 (AFSA). *See* Pub.L. No. 105–89, 111 Stat. 2115; 42 U.S.C. § 675; *see also* Act No. 391, 1998 S.C. Acts. As the dissent notes, the General Assembly complied with AFSA by adopting section 63–7–2570(8). However, the dissent mischaracterizes the statute's temporal requirement and states that "unlike other enumerated TPR grounds," section 63–7–2570(8) "does not involve some type of parental conduct or inaction that demonstrates unfitness." As explained, *supra,* courts may not terminate a parent's rights under section 63–7–2570(8) absent a showing that termination is in the best interests of the child, and that the delay in reunification of the family unit is attributable to the parent's inability to adequately provide for the child. The facts of this case undoubtedly establish that Mother is primarily responsible for the delays in resolution of this case, and she has repeatedly refused to remedy the issues preventing her from taking custody of her children. Thus, Mother's unfitness is demonstrated not only by her inadequate parenting, but also by her inaction over the course of several years.

statute can be challenged based on the ground that application of the statute has violated a parent's constitutional rights. This could obviously be true if a family court approved TPR, pursuant to the statute, based merely upon the passage of time, or due to circumstances largely outside the control of the parent. However, Mother has not challenged the statute under an as-applied theory. Consequently, that question is not properly before this Court. *Rosamond Enters., Inc. v. McGranahan,* 278 S.C. 512, 513, 299 S.E.2d 337, 338 (1983) (holding that appellant may not argue different ground on appeal than she argued at trial). Thus, the only question before us is whether DSS proved the termination ground by clear and convincing evidence.

## II. Clear and Convincing Evidence

■ DSS argues that the court of appeals erred in reversing the family court's order terminating Mother's parental rights. We agree. As DSS argues, the facts of this case do not represent a "procedural morass," but instead show prolonged foster care because of valid court findings that reunification of the family unit was not in the children's best interests. Now that a family has stepped forward to provide a stable environment for the children, this Court will not contribute to further delay.

In its unpublished opinion, the court of appeals cited *Marccuci* and *Loe v. Mother, Father, & Berkeley County Department of Social Services,* 382 S.C. 457, 471, 675 S.E.2d 807, 814 (Ct.App.2009), to support its determination that DSS failed to prove the statutory grounds for termination by clear and convincing evidence, or that TPR would serve the best interests of the children. Ordinarily we would not provide an extensive retelling of the facts of these prior cases. However, because of the significant factual distinctions between those cases and the case sub judice, a review is necessary.

In *Marccuci,* Sean Taylor appealed a TPR order regarding his three year old daughter. 396 S.C. at 220, 721 S.E.2d at 769–70. The minor child was born to Taylor and Christine Marccuci in September 2005. *Id.* In September 2007, Marccuci relocated to South Carolina with the child. *Id.* at 221, 721 S.E.2d at 770. Taylor moved in with Marccuci in North

Charleston, with a long-term plan of returning to New Jersey with his child. *Id.* On January 23, 2008, police came to the hotel in search of Marccuci after she failed to report to work. *Id.* A police background check on Taylor erroneously reported that he had an outstanding warrant for rape in New Jersey. *Id.* Police arrested Taylor and placed the child in DSS protective custody. *Id.* Although no outstanding warrant existed, the trip to South Carolina violated Taylor's prior unrelated probationary sentence, and he was jailed until June 2008. *Id.* at 221–22, 721 S.E.2d at 770–71. Upon his release, Taylor remained subject to an order restraining him from contact with his daughter, but DSS requested priority placement evaluation with his parents (Grandparents), who resided in New Jersey. *Id.* at 222, 721 S.E.2d at 770.

However, Grandparents were unable to take custody of the child due to errors by DSS and the court system. Justice Hearn astutely observed the "procedural morass" that unfairly prevented timely reunification of Taylor and his daughter:

> The action began in a timely manner on January 28, 2008, with the probable cause hearing. The merits hearing was scheduled for February 28, but the court continued it.... At some point the merits hearing was set for June 4. However, a pre-trial hearing scheduled for May 13 was continued until June 18 because no judge was available; the June 4 merits hearing accordingly was rescheduled for October 1.... Frustrated at the lack of progress in this case, [Grandparents] moved for an expedited placement hearing, but that too was continued on December 8 for unknown reasons. On January 22, 2009, the hearing on the expedited motion was again continued. The merits hearing was then scheduled for April 30, nearly fifteen months after the minor child was removed by DSS, to no avail; it was continued for lack of notice. The hearing was once again continued on May 4 for the same reason. It was not until July 10—far beyond the thirty day limit provided by statute—that the merits hearing was held, and the final order was not issued until August 3, over one-and-a-half years after the child was placed in protective custody.

*Id.* at 771–72, 721 S.E.2d at 223–24. Thus, this Court reversed the order of the family court terminating Taylor's parental rights.

In *Loe*, the parents married in 2002 and divorced in 2004. 382 S.C. 457, 459, 675 S.E.2d 807, 808. They had three children together: sister, and twins, daughter and son. *Id.* When daughter was six months old, she was severely injured, reportedly while in the father's care. *Id.* A physician diagnosed daughter's condition as non-accidental, subdural hematomas, *i.e.* bleeding on the brain, which is often associated with "Shaken Baby Syndrome." *Id.* DSS took the children into emergency protective custody, and the family court granted DSS custody of the three children following a probable cause hearing. *Id.* at 459, 675 S.E.2d at 808–09. In October 2003, DSS voluntarily returned sister to mother's custody. *Id.* at 460, 675 S.E.2d at 809. In August 2004, the family court conducted an initial permanency planning hearing, and DSS recommended a permanent plan of reunification of daughter and son with the mother. *Id.* at 460, 675 S.E.2d at 809. However, the court granted a DSS request for an extension for reunification due to son's significant physical disabilities and daughter's developmental problems resulting from her injuries. *Id.* Over the next two years, the mother's unsupervised visitation, including overnight stays, increased. However, in 2005, son and daughter's foster parents filed actions against the mother and father, and DSS, seeking termination of the parent's rights, and *inter alia*, the issuance of a decree of adoption. *Id.* at 461, 675 S.E.2d at 809. This development did not prevent DSS from moving forward with reunification plans. *Id.* In January 2007, the mother filed an answer to the foster parent's complaint and stated that DSS should return custody of daughter and son to her because she had completed the terms of her DSS plans. *Id.* at 462, 675 S.E.2d at 810. In February 2007, the family court conducted a hearing and found the mother satisfied four statutory grounds for termination, including that son and daughter has been in foster care for fifteen of the most recent twenty-two months. *Id.* at 465, 675 S.E.2d at 812.

On appeal, the mother in *Loe* argued that "the actions of others raised barriers and caused delays that resulted in her children remaining in foster care beyond the statutory time required to trigger this ground for TPR." *Id.* at 469, 675 S.E.2d at 813. Interestingly, DSS aligned itself with mother

in opposing TPR. *Id.* at 465, 675 S.E.2d at 812. DSS testified that it caused delays in reunifying Mother with her children:

> DSS dropped the ball. And that really is not something [the mother] has any control over. DSS does have its shortcomings and we are working to overcome those shortcomings, but the fact remains that a good many of the delays in this case have been departmental and not because of anything [mother] did. So while it is true that the children have been in foster care 15 of the last 22 months . . . that can't all be ascribed to mother.

*Id.* at 469, 675 S.E.2d at 814. Based on these unfortunate circumstances, the court of appeals reversed the family court's TPR order. *Id.* at 474, 675 S.E.2d at 816.

The facts of the instant case bear little, if any, resemblance to those of *Marccuci* and *Loe.*

As the family court noted, a review of the court proceedings in this case demonstrates that "the failure of having the children returned to the parents rests squarely on the parent's shoulders." For example, the family court continued the November 15, 2007, hearing at the request of Mother's attorney. On December 20, 2007, the family court found that it would be contrary to children's best interests to be returned to Defendants' custody. On June, 12, 2008, in a review hearing, the family court found that Defendants failed to complete the requirements set forth in the court approved Placement Plan. Thus, the terms and conditions of that Plan had to be extended. On September 4, 2008, DSS issued a Supplemental Report recommending reunification of the children with Defendants. However, at the September 30, 2008, Permanency Planning hearing, Father's prior stipulation to committing sexual abuse of a minor child came to light. The court ordered a full investigation of previously undiscovered issues, and a six-month extension of the Plan. On January 23, 2009, DSS issued a second Supplemental Report and recommended TPR due to Mother's inability to complete a drug treatment program following a positive drug test, and her continued co-habitation with Father. DSS also demonstrated that Father could not obtain adequate housing or economically provide for the needs of the children. On August 17, 2009, the family court refused to terminate Defendant's parental rights

and found that DSS failed to provide Defendants with certain services to assist them in meeting their goals. However, the court cautioned Defendants against further delay in resolving the reunification issue.

Following this admonishment, Father tested positive for cocaine on January 12, 2010. In the final family court order approving TPR as in the best interests of the children, the family court noted that Defendants tested positive for drugs but denied drug use, that Mother could not assert herself and protect the best interests of the children, and that Defendants maintained a limited budget that failed to provide for all of the children's necessities.

■ Our review of the Record establishes that Defendants are responsible for the significant delays in this case. Admittedly, the late discovery and subsequent investigation of Father's prior act of sexual abuse meant that DSS could not accomplish its previously stated goal of reunification. However, DSS failed to discover the court order because state law purged the record from the Statewide Central Registry, not because of agency shortcomings. This of course does not represent the kind of significant delay evident in *Loe*. Additionally, although at least five family court judges presided over different phases of this action, each judge issued cogent and detailed orders balancing the best interests of the children and Defendant's fundamental rights.

As the family court observed, this case "could serve as the 'poster child case' for how children can end up languishing in foster care." While at times Mother has taken steps to remedy the situation leading to removal of the children, she has failed to make the necessary lifestyle changes to provide them with a safe and stable environment. The first continuance of the Placement Plan was not at the request of DSS, but instead due to Mother's failure to complete the Plan's requirements. Mother still refuses to take responsibility for her own drug activity, and has failed to show that she can provide for the children without the help of Father. Father has admitted that he cannot maintain adequate housing and employment, and stipulated to prior sexual abuse of a minor. However, Mother has continued to cohabitate with Father, even right up until the oral argument of this case. Although Mother has

paid lip service to the requirements of reunification, she has taken no legitimate or significant steps toward actually meeting those requirements. Thus, viewing the Record in its totality, we cannot attribute the delays in this case to DSS, or find that DSS made it impossible for Mother to regain legal custody of her children prior to the expiration of the fifteen-month period. Consequently, the court of appeals erred in finding that DSS did not meet its burden of proving termination of Mother's parental rights was in the children's best interests.[3]

There is perhaps no relationship more sacred than that of parent and child. We have long recognized and respected the fact that a parent's fundamental rights cannot be discarded simply because they have not been model parents or find their children under the control of the State. *See Santosky*, 455 U.S. at 753, 102 S.Ct. 1388. Despite the importance of these rights, the purpose of the statutory ground allowing for TPR once a child has been in foster care for fifteen of the last twenty-two months is to ensure that children do not languish in foster care when TPR is in their best interests. *Charleston Cnty. Dep't of Soc. Serv. v. Jackson*, 368 S.C. 87, 101–02, 627 S.E.2d 765, 773 (Ct.App.2006). Appellate courts must consider the child's perspective, and not the parent's, as the primary concern when determining whether TPR is appropriate. *See id.* at 102, 627 S.E.2d at 773. Adoptive parents have stepped forward and provided a loving and stable environment, and the children wish to remain a part of that environment. This

---

3. We acknowledge Justice Pleicones's dissent and believe that this opinion and his separate writing sufficiently illustrate our differing views of the facts of this case. Justice Pleicones would refuse to find that any of the delay between October 2007, when the family court awarded DSS emergency protective custody, and March 2010 can be attributed to Mother. However, this viewpoint ignores the Mother's drug use and unwillingness to address that issue. The viewpoint also ignores the threat posed by Father, given his admitted cocaine use and a court finding that he more than likely molested a child. This is not a view we can accept. In addition, the majority fully realizes that poverty is not a ground for TPR. Finally, our decision today does not rest on the presence or absence of secondhand smoke in Mother's home. Instead, as discussed *supra*, this difficult decision rests squarely on Mother's refusal to take the necessary steps toward reunification with the children, and that Defendants, rather than the State, are primarily responsible for the significant delays in this case.

Court will not prolong the uncertainty of their status only to give more time to a biological parent who refuses to place herself in a position to be awarded custody of her children.

Accordingly, we hold that the family court properly terminated Mother's parental rights pursuant to section 63-7-2570(8) of the South Carolina Code. Thus, we reverse the decision of the court of appeals and direct DSS to immediately implement a plan consistent with the findings of the family court.

**REVERSED.**

KITTREDGE and HEARN, JJ., concur.

PLEICONES, J., dissenting in a separate opinion.

BEATTY, J., dissenting in a separate opinion.

Justice PLEICONES:

I respectfully dissent and would affirm the Court of Appeals reversal of the family court order terminating respondent's (Mother's) parental rights. Like the Court of Appeals, I would find that petitioner Department of Social Services (DSS) did not meet its burden of proving by clear and convincing evidence that the children have remained in foster care because of Mother's actions or inactions. *See Charleston Cnty. Dep't of Soc. Servs. v. Marccuci*, 396 S.C. 218, 721 S.E.2d 768 (2011) (no TPR where much of child's time in DSS custody is not attributable to parent). As explained below, the majority and I read the record here very differently.

Mother's two children were taken into protective custody by DSS in early October 2007 because of abysmal living conditions.[4] DSS filed a report on September 4, 2008, supporting the return of the children to Mother and scheduled a hearing for September 18, 2008. At that hearing, DSS informed the court and the parties that there were additional unaddressed issues, most relating to a 1994 DSS order which found that Vaughn S., father of Mother's two minor children, had "more likely than not sexually abused" his daughter from a different

---

4. Mother had already sent the older child to live with a relative and had filled out the school forms necessary for that relative to enroll the child in the relative's district.

relationship[5]. Additionally, DSS averred that in July 2008, the parties' seven-year-old daughter had made statements that "raised the specter of alcohol and drug abuse and [of] substantial neglect." Despite these concerns raised for the first time at the hearing, DSS adhered to its recommendation that the children be returned to Mother's custody, with Vaughn's visitation to be strictly supervised by another adult, that Mother submit to a drug and alcohol assessment and comply with any recommendations, that she submit to random drug tests, and that she successfully complete a parenting skills class.

The family court declined to reunite Mother and the children, instead extending the reunification permanency plan for six months. DSS was ordered to conduct a complete and thorough investigation "with all due diligence" of the new issues it raised at the September 2008 hearing.

Mother tested positive for cannabinoid and cocaine in December 2008, but denied using illegal drugs. As a result of her insistence that she had not used illegal drugs, the drug assessment agency closed her file. In February 2009, the family court held another hearing and ordered DSS to commence a termination of parental rights (TPR) action within sixty days.

DSS then sought to terminate Mother's rights for failure to support and because the children had been in DSS custody for fifteen of the past twenty-two months. The family court issued an order after a hearing on July 31, 2009, finding there was no evidence that Mother willfully failed to support her children. The family court also found that termination was not in the children's best interest:

> [Mother and Vaughn] claim that [DSS] was dilatory and mishandled this case which resulted in the extended time in which the children have been in [DSS]'s custody. The evidence supported [Mother and Vaughn]'s claims that [DSS] failed to provide services to them to assist them in meeting their goals. It is undeniable that had [DSS] had [sic] uncovered subsequently discovered concerns sooner,

---

5. From the record before the Court, it appears that Vaughn's court appointed attorney did not appear at the 1994 hearing where Vaughn consented to entry of this finding. Despite this finding, the same order granted Vaughn supervised visitation with this child.

the parents would have been afforded more time to adequately address those concerns and more importantly, to consider the consequences of failing to address those concerns.

The court went on to order that a reunification plan be developed prior to August 27, 2009, when a hearing was scheduled to submit the plan.

In August 2009, the family court approved the new reunification plan. The court set a deadline of March 4, 2010, for successful completion of the plan's requirements by Mother and Vaughn.

This matter was next before the family court in April 2010, resulting in a May 2010 order which was vacated and a new order substituted *nunc pro tunc* in August 2010.[6] At the April 2010 hearing, DSS again sought permission to terminate both Mother's and Vaughn's parental rights. DSS acknowledged that Mother had basically complied with the placement plan, but maintained that the parents' income was not sufficient to support the children.[7] The family court order permitted DSS to again seek TPR. This TPR action was commenced April 28, 2010,[8] with Mother being served on May 13, 2010.

The TPR hearing originally set for August 27, 2010, was continued due to a bona fide medical emergency suffered by Vaughn on August 25. The matter finally came before the court on January 27, 2011. The family court judge made the following findings regarding the best interests of the children as they relate to Mother. He found she had demonstrated "a lack of total commitment" to the children because (1) Mother used illegal drugs at least once; (2) she did not provide child support until ordered to; and (3) she never requested unsupervised visitation. He also found that Mother has a passive and submissive nature and therefore could not protect the children from the threats posed to them by Vaughn; that her present home environment. is questionable given concerns

---

6. I strongly disagree with the majority's findings that any of the delay between October 2007 and March 2010 can be attributed to Mother.

7. Poverty is not a ground for TPR.

8. I note that DSS commenced the TPR action prior to entry of the family court order.

about the children's sleeping arrangements, the second hand smoke, and the fact she had started a new job only two days earlier; that there remained an unsettled question where she would live if she could not live with Vaughn; that if returned to her custody, the children would have to ride with their grandmother to drop Mother off at work at 11:30 pm; and that the children had "special needs." [9] As explained below, I do not find clear and convincing evidence that these issues demonstrate Mother's lack of commitment to being reunited with her children.

The evidence in the record shows that while Mother had a single positive drug screen in December 2008, she had willingly taken and passed every other drug test since 2007; that Mother has timely paid every child support payment; [10] and that while she may never have asked for unsupervised visitation, she has never missed a visit with her children. The DSS caseworker testified there is a loving bond between Mother and her children, as there is between Vaughn and the children and Mother's mother and the children. It is unclear what "threats" Vaughn posed to the children, but his rights have now been terminated. Further, despite concerns about Mother's timid and submissive nature, the same character traits that caused the family court to consider the daughter "special needs," the psychological counselor who examined Mother and Vaughn at DSS's behest did not suggest either needed any treatment nor was he concerned about either parent's suitability to live with the children even in light of the 1994 finding against Vaughn.

At the time of the TPR hearing in January 2011, Mother, Vaughn, and Mother's mother were sharing a three bedroom trailer, meaning the children might have to share a room. Unlike the family court, I am not convinced that the lack of a separate bedroom for each child demonstrates a lack of parental commitment. While the GAL and DSS caseworker expressed concerns about second-hand smoke, neither they nor

---

9. The son has ADHD and the daughter is described as unsure, timid, a follower who has difficulty making decisions. Further, her problem solving skills "are not appropriate for a child her age."

10. Recall that in the July 2009 order, the family court found no evidence that Mother had willfully failed to support the children.

the court suggested that exposing children to second-hand smoke makes a person an unfit parent.[11] Moreover, Mother was in the process of seeking section 8 housing in an apartment complex at the time of this TPR hearing which would allow her to live apart from Vaughn.[12] Finally, while it is true that Mother testified that the children would have to ride with her when her mother dropped her off at 11:30 pm for work, in my view, this is a reflection of Mother's socioeconomic reality and not her parental fitness.[13]

The Court of Appeals reversed the termination order, finding that the sole ground upon which the termination rested, that the children had been out of the home for fifteen of the past twenty-two months, was inapplicable. The Court of Appeals held there was not clear and convincing evidence that DSS did not bear responsibility for many of the delays in this case, a fact which voids the TPR on the 15/22 months ground.[14] Further, the Court of Appeals found that although the foster parents might offer advantages that Mother could not, "the fundamental right of a fit parent to raise his or her child must be vigorously protected." *SCDSS v. Sarah W.,* Op. No. 2011–UP–514 (Ct.App. filed November 29, 2011) citing *Loe v. Mother, Father, and Berkeley Cnty. Dep't of Soc. Servs.,* 382 S.C. 457, 471, 675 S.E.2d 807, 815 (Ct.App.2009).[15] The Court of

---

11. I note there is no evidence that either child suffers respiratory or allergy problems.

12. Mother had secured such housing for herself and the children prior to the September 2008 hearing at which she expected to receive custody. She lost this housing, however, when she was denied custody.

13. The record reflects that Mother had just begun a full-time job two days before the TPR hearing, a job which would afford her and the children benefits after 45 days. Prior to obtaining this job, Mother had worked for four and a half years at a restaurant, where her status as a shift worker prevented her from achieving full-time status and its attendant benefits.

14. Recall that in July 2009, less than a year before this TPR action was commenced, a family court judge had found that DSS was largely responsible for the failure of the family to be reunited. Arguably this unappealed order is the law of the case and requires that the twenty-two month period in § 63-7-2570(8) be restarted as of July 2009.

15. The majority, however, rests its clear and convincing evidence finding on this telling fact: "Now that a family has stepped forward to

Appeals reversed the order terminating Mother's parental rights and we granted certiorari to review that decision.[16]

I would affirm the decision of the Court of Appeals, thereby negating the necessity of reaching the constitutionality of § 63–7–2570(8) (2010) as a "stand-alone" ground for TPR. Were I to reach the issue, I agree with Justice Beatty that the statute is unconstitutional, even as narrowed by our earlier decisions requiring that the delay in returning the children to their parent's home be attributable to the parent's conduct. I do not agree, however, that the statute's constitutionality can be salvaged by engrafting a requirement that the family court also make a specific finding that the parent is unfit. In my opinion, the addition of this requirement, without any specification of relevant considerations, renders the statute as newly construed unconstitutionally vague. *E.g., Johnson v. Collins Entertainment Co., Inc.,* 349 S.C. 613, 564 S.E.2d 653 (2002) (statute that does not give fair notice of forbidden conduct is unconstitutionally vague); *Toussaint v. State Bd. of Med. Examiners,* 303 S.C. 316, 400 S.E.2d 488 (1991) ("A law is unconstitutionally vague if it forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess as to its meaning and differ as to its application.").

A New York statute required that in order to terminate parental rights, the state establish both that it made diligent efforts to assist the parental relationship and that the parent failed "substantially and continuously or repeatedly to maintain contact with or plan for the future of the child although physically and financially able to do so." The United States

provide a stable environment for the children, this Court will not contribute to further delay." I agree that stability is important for these children, but note that while they were placed in the same foster home from August 2007 until June 2010, they were moved to a new home after this TPR action was commenced because their first foster family adopted two other children. Moreover, it is inappropriate to consider the children's desire to remain with their current foster family or the availability of an adoptive family in determining whether clear and convincing evidence exists for terminating parental rights.

16. The majority's concern with Mother's delay discounts the fact that Mother prevailed on appeal, and that the only reason this matter was not concluded in November 2011 is because two members of this Court granted certiorari in May 2012.

Supreme Court found this statute employed "imprecise substantive standards that leave determination unusually open to the subjective values of the judge" and expressed concern that "[b]ecause parents subject to termination proceedings are often poor, uneducated, or members of minority groups ... such proceedings are often vulnerable to judgments based on cultural or class bias." *Santosky v. Kramer*, 455 U.S. 745, 762–3, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). A requirement of "unfitness" leaves the decision whether to terminate a parent's parental rights entirely to the subjective values of the family court judge, giving even less guidance than did the New York statute.

Moreover, unlike Justice Beatty, I would not remand this case with instructions that the family court determine Mother's parental fitness under this new test. Leaving aside my concern with whether DSS can meet the 15/22 month requirement especially in light of Mother's successful appeal, it is for DSS in the first instance to review the facts of this case and determine whether it believes there is clear and convincing evidence of Mother's parental unfitness.

I also believe that Justice Beatty's instructions that the family court decide fitness based upon its assessment of Mother's future ability to adequately provide for the basic needs of her children erroneously focuses on predicting her future actions and erroneously places the burden on her to disprove unfitness. In my opinion, we err when we terminate parental rights on anticipated conduct. *Cf.* S.C.Code Ann. § 63–7–2570(6) (2010) (TPR on ground parent has a diagnosable condition unlikely to change within a reasonable time). I am especially concerned that most of the issues which Justice Beatty would instruct the family court to consider—housing, food, clothing, and medical care—are subject to unconscious bias based upon Mother's poverty as is demonstrated by the TPR order here. Moreover, under the circumstances of this case, these issues mirror the grounds for termination set forth in § 63–7–2570(2), which permits termination where a parent has not remedied the conditions which led to the children's removal. While DSS pled that Mother had not remedied the conditions under 2570(2), the family court declined to termi-

nate Mother's rights on this ground. I would not revisit that issue.

I would affirm the decision of the Court of Appeals.

Justice BEATTY.

I respectfully dissent as I believe section 63–7–2570(8) [17] is facially unconstitutional to the extent it is used as the sole basis for TPR. In my view, section 63–7–2570(8) is unconstitutional as it impermissibly creates a presumption of parental unfitness due solely to the length of time a child spends in foster care. In order to comport with the guarantees of substantive due process, a determination of parental unfitness is a condition precedent to termination of a parent's fundamental right to the custody of his or her child. As will be discussed, I agree with the decision of the Court of Appeals to the extent it reversed the termination of Respondent's parental rights; however, I would remand the matter to the family court for a determination of Respondent's parental fitness and, ultimately, whether her parental rights should be terminated.

## I.

Although our decision in *Marccuci* addressed the implications of section 63–7–2570(8), constitutionality was not an issue in that case. *Charleston County Dep't of Soc. Servs. v. Marccuci*, 396 S.C. 218, 721 S.E.2d 768 (2011). In *Marccuci*, we merely held that strict adherence to section 63–7–2570(8) is not warranted in every case. *Id.* at 226, 721 S.E.2d at 773. Specifically, we found that where there is substantial evidence that much of the delay is attributable to the acts of others, a parent's rights should not be terminated based solely on the fact that the child has spent greater than fifteen months in foster care. *Id.* at 227, 721 S.E.2d at 773. Essentially, we considered an "as-applied" challenge in *Marccuci*. In contrast, the Respondent in the instant case explicitly challenged section 63–7–2570(8) as facially unconstitutional. Thus, it is incumbent upon this Court to now definitively analyze this constitutional question. *See S.C. Dep't of Soc. Servs. v. Cochran*, 356 S.C. 413, 420, 589 S.E.2d 753, 756 (2003) ("We leave

---

17. S.C.Code Ann. § 63–7–2570(8) (2010).

for another day the analysis of whether section [63–7–2570(8) ] . . . is unconstitutional.").

Pursuant to section 63–7–2570(8) the family court may order the termination of parental rights upon a finding that "[t]he child has been in foster care under the responsibility of the State for fifteen of the most recent twenty-two months" and a finding that "termination is in the best interest of the child." § 63–7–2570(8). In evaluating the text of this statute, I adhere to the well-established rule of statutory construction that "it is the duty of the court to ascertain the intent of the Legislature and to give it effect so far as possible within constitutional limitations." *Brown v. County of Horry*, 308 S.C. 180, 183, 417 S.E.2d 565, 567 (1992).

Our state and federal Due Process Clauses provide that no person shall be deprived of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1; S.C. Const. art. I, § 3. It has been "long recognized that the [Fourteenth] Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.'" *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)). "The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Id.* (quoting *Glucksberg*, 521 U.S. at 720, 117 S.Ct. 2302).

Without dispute, a parent's interest in the custody of his or her child is a fundamental right that must be recognized in TPR proceedings. *See Troxel*, 530 U.S. at 66, 120 S.Ct. 2054 ("[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). As the United States Supreme Court (USSC) has explained:

> The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of

their family life. If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs. When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures.

*Santosky v. Kramer,* 455 U.S. 745, 753–54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that before the State may terminate parental rights, due process requires that the State support its allegations by at least clear and convincing evidence). Therefore, any deprivation of this fundamental right is subject to strict scrutiny. *See Troxel,* 530 U.S. at 80, 120 S.Ct. 2054 (recognizing that state action, which limits the fundamental right of parents to make decisions concerning the care, custody and control of their children, is subject to strict scrutiny (Thomas, J., concurring)); *see also Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988) (noting that state actions affecting fundamental rights are given the most exacting scrutiny). As a result, section 63–7–2570(8) must be "narrowly tailored to serve a compelling state interest." *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).

As the majority recognizes, the State has a compelling interest in preventing children from languishing for years in foster care.[18] However, section 63–7–2570(8), one avenue by which the State may pursue this goal, creates a presumption of unfitness based solely on the length of time a child has spent in foster care. The length of time a child spends in foster care is not inversely proportional to the level of parental fitness. Without a specific determination of parental fitness, I find that section 63–7–2570(8) is not narrowly tailored to achieve the State's interest as this statutory ground deems irrelevant a consideration of whether a parent is able to care

---

18. Indeed, the General Assembly has proclaimed:

> The purpose of this article is to establish procedures for the reasonable and compassionate termination of parental rights where children are abused, neglected, or abandoned in order to protect the health and welfare of these children and make them eligible for adoption by persons who will provide a suitable home environment and the love and care necessary for a happy, healthful, and productive life.

S.C.Code Ann. § 63–7–2510 (2010).

for his or her child. *See In re H.G.*, 197 Ill.2d 317, 259 Ill.Dec. 1, 757 N.E.2d 864, 872–74 (2001) (concluding that TPR based solely on the ground that the child has been in foster care for fifteen months violated substantive due process as the presumption of parental unfitness contained in the subsection was "not a narrowly tailored means of identifying parents who pose a danger to their children's health or safety" as there may be "cases in which children remain in foster care for the statutory period even when their parents can properly care for them"); *In re Kendra M.*, 283 Neb. 1014, 814 N.W.2d 747, 760–61 (2012) ("[P]arental rights cannot be terminated solely based on the duration of the out-of-home placement, because it must also be shown that the parent is unfit and that termination is in the best interests of the child. . . . The fact that a child has been placed outside the home for 15 or more months of the most recent 22 months does not demonstrate parental unfitness.").

As the USSC has noted, the "Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'" *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (quoting *Smith v. Org. of Foster Families*, 431 U.S. 816, 862–63, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977)). "[S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68, 120 S.Ct. 2054.

Thus, for a TPR action based only on section 63–7–2570(8) to withstand constitutional muster, the family court must make an explicit finding of parental unfitness *before* considering the best interests of the child. This point is where I depart from the majority as its analysis makes no such determination. Instead, the majority deems section 63–7–2570(8) constitutional because a parent's fundamental rights in a TPR proceeding are preserved via an assessment of the fault for the length of time a child has been in foster care and a determination of the best interests of the child. Although I

agree these are correct considerations, they are made within the context of an "as-applied" challenge such as in *Marccuci.* Here, however, we are called upon to analyze a strictly facial challenge to section 63–7–2570(8).

Because subsection 8, unlike the other enumerated TPR grounds,[19] does not involve some type of parental conduct or inaction that demonstrates unfitness, it impermissibly creates a presumption of parental unfitness due solely to the length of time a child spends in foster care. In order to comport with the guarantees of substantive due process, a determination of parental unfitness is a condition precedent to termination of a parent's fundamental right to the custody of his or her child.

I believe this analytical framework is constitutionally mandated as TPR involves the involuntary and irrevocable termination of parental rights, which is fundamentally distinguishable from a child custody dispute in a divorce proceeding or a proceeding where a parent has voluntarily relinquished custody and seeks to regain custody. In those contexts, a consideration of parental fitness is implicit in the determination of the best interests of the child. *See Charleston County Dep't of Soc. Servs. v. King,* 369 S.C. 96, 103, 631 S.E.2d 239, 243 (2006) (holding that best interest factors set forth in *Moore v. Moore,* 300 S.C. 75, 386 S.E.2d 456 (1989) were inapplicable to a TPR situation as that situation is governed by statute); *Patel v. Patel,* 347 S.C. 281, 285, 555 S.E.2d 386, 388 (2001) (recognizing, in a child custody case, that "family court considers several factors in determining the best interest of the child, including: who has been the primary caretaker; the conduct, attributes, and fitness of the parents; the opinions of third parties (including GAL, expert witnesses, and the children); and the age, health, and sex of the children"); *Moore,* 300 S.C. at 78–79, 386 S.E.2d at 458 (holding that family court should consider the following criteria in making custody determination when a natural parent, who has voluntarily relinquished custody of his child, seeks to reclaim custody: (1) the parent must prove that he or she is a fit parent, able to properly care for the child and provide a good home; (2) the

---

19. *Cf.* S.C.Code Ann. § 63–7–2570(1)–(4) (identifying grounds for TPR as including a parent's abuse or neglect of the child, failure to remedy the conditions that caused the removal of the child from the home, willful failure to visit the child, and willful failure to support the child).

amount of contact, in the form of visits, financial support or both, which the parent had with the child while the child was in the care of a third party; (3) the circumstances under which temporary relinquishment occurred; and (4) the degree of attachment between the child and the temporary custodian).

Furthermore, I believe that my interpretation is consistent with the intended purpose of subsection 8. In 1998, in an effort to receive federal funding, our General Assembly enacted subsection 8 in direct response to the federal Adoption and Safe Families Act ("ASFA") of 1997.[20] Act No. 391, 1998 S.C. Acts 2340. The ASFA was passed by Congress "to promote the adoption of children who have been placed in foster care, to ensure their health and safety, and to encourage permanent living arrangements for such children as early as possible." Kurtis A. Kemper, Annotation, *Construction and Application by State Courts of the Federal Adoption and Safe Families Act and Its Implementing State Statutes*, 10 A.L.R.6th 173 (2006 & Supp.2012). "In order to receive federal funds, states are required under ASFA to implement plans which, among other things, limit the obligation to provide reasonable efforts to reunify parents with children in foster care, require permanency hearings within 12 months after a child enters foster care, and require the state to file or join a petition to terminate parental rights, subject to certain exceptions, when a child has been in foster care for 15 of the most recent 22 months or when a parent has committed certain serious crimes." *Id.*

Although our General Assembly complied with the ASFA by adding subsection 8 to the pre-existing TPR statute, Congress did not intend for the fifteen-month requirement to constitute an independent ground or basis for actually terminating the rights of a parent. Elizabeth O'Connor Tomlinson, *Termination of Parental Rights Under Adoption and Safe Families Act (ASFA)*, 115 Am.Jur. Trials 465, § 9 (2010 & Supp.2012). Instead, "the 15/22 provision triggers only the *filing* of a petition to terminate parental rights." Emily K. Nicholson, Comment, *Racing Against the ASFA Clock: How Incarcerat-*

---

**20.** Pub.L. No. 105–89, 111 Stat. 2115 (codified as amended in scattered sections of 42 U.S.C. §§ 670–678 (1998)).

*ed Parents Lose More Than Freedom,* 45 Duq. L.Rev. 83, 85 n. 16 (2006).

Thus, by approving subsection 8 as an independent basis for TPR, the majority goes against the clear legislative intent of the ASFA. *See In re M.D.R.,* 124 S.W.3d 469, 476 (Mo.2004) (interpreting 15/22 provision of state TPR statute, which tracks the language of the ASFA, and stating, "By considering the history and the circumstances of the enactment of subsection 2 and harmonizing the provisions of the termination statute in its entirety, it is clear the legislature did not intend section 211.447.2(1) [of the Missouri Revised Statutes] as a ground for termination, but rather solely as a trigger for filing a termination petition"). As a result, the majority creates an unconstitutional presumption of parental unfitness due solely to the length of time a child has been in foster care.

## II.

Because my decision represents a new construction of section 63–7–2570(8), I recognize the substantive and procedural implications as to the family court and Respondent who did not have the benefit of this analysis. Accordingly, I would remand the matter to the family court to make a determination regarding Respondent's parental fitness and, ultimately, whether her parental rights should be terminated. In assessing whether Respondent is a fit parent, I would instruct the family court to determine whether Respondent can adequately provide for the basic daily needs of the minor children such as housing, personal safety, food, clothing, and medical care. Due to this inherently case-specific determination, I decline to enumerate factors for which the family court should consider as it would be impossible and myopic to identify an all-inclusive list.

However, in reaching its decision, I would urge the family court to weigh certain facts that have been established during this protracted proceeding. In terms of Respondent's ability to care for the minor children, I note that Respondent: performed adequately on her psychological evaluation; procured full-time employment; sought to acquire living arrangements that are separate from Vaughn; sought the assistance of her mother as a supplemental caregiver to the children;

and maintained a bond with the children as she has not missed an opportunity to visit with her children. Even though Respondent has made positive strides to demonstrate her fitness as a parent, I am gravely concerned that Respondent still cohabitates with Vaughn despite his admitted sexual misconduct toward his minor daughter from a previous relationship and his continued drug use. Furthermore, the children, who are nearly ten and eleven years old, have expressed their desire not to be returned to Respondent's home. However, the record is unclear as to the children's reasons for not desiring to return to Respondent's home. By all accounts, the children were happy when Respondent visited with them and were sad when the scheduled visitation period ended.