**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

South Carolina Department of Social Services,
Respondent,

v.

Natalia Coj and Fernando Hernandez, Appellants.

In the interest of minors under the age of eighteen.

Appellate Case No. 2019-001906

———————

Appeal From Greenville County
Tarita A. Dunbar, Family Court Judge

———————

Unpublished Opinion No. 2020-UP-305
Submitted October 9, 2020 – Filed November 6, 2020

———————

**AFFIRMED**

———————

Matthew J. Kappel, of The Law Office of Matthew J. Kappel, PC; and J. Falkner Wilkes, both of Greenville, for Appellants.

Amanda B. Stiles and Rebecca Rush Wray, both of the Department of Social Services, of Greenville, for Respondent.

Megan Goodwin Burke, of Greenville, as Guardian ad Litem.

---

**PER CURIAM:** Natalia Coj (Mother) and Fernando Hernandez (Father; collectively, Parents) appeal an order terminating their parental rights to Child 1, Child 2, and Child 3 (collectively, Children). On appeal, Parents argue the family court erred in finding (1) clear and convincing evidence showed their home could not be made safe due to severe or repetitious harm, and (2) termination of parental rights (TPR) was in Children's best interest. We affirm.

On appeal from the family court, this court reviews factual and legal issues de novo. *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011); *Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011). Although this court reviews the family court's findings de novo, we are not required to ignore the fact that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Lewis*, 392 S.C. at 385, 709 S.E.2d at 651-52.

The family court may order TPR upon finding a statutory ground for TPR is met and TPR is in the child's best interest. S.C. Code Ann. § 63-7-2570 (Supp. 2019). The grounds for TPR must be proved by clear and convincing evidence. *S.C. Dep't of Soc. Servs. v. Parker*, 336 S.C. 248, 254, 519 S.E.2d 351, 354 (Ct. App. 1999).

The Department of Social Services presented clear and convincing evidence showing a child residing with Parents was severely and repetitiously harmed such that it was not reasonably likely Parents' home could be made safe within twelve months. *See* § 63-7-2570(1) (providing a statutory ground for TPR is met when "[t]he child or another child while residing in the parent's domicile has been harmed . . . , and because of the severity or repetition of the abuse or neglect, it is not reasonably likely that the home can be made safe within twelve months"). Children were removed from Parents on March 31, 2018, due to the severe abuse and neglect of Child M, who lived with Parents and Children.[1] Dr. Nancy Henderson, an expert in pediatric child abuse and neglect, examined Child M on March 31, 2018. She testified Child M's injuries included a transacted hymen, which indicated penetrating sexual trauma; "quite a bit of bruising and scars on her

---

[1] Child M was removed from Parents' home the prior day; she is not Parents' biological child and is not a party to this action.

face, her abdomen, [and] her lower extremities"; looped-patterned scars on her legs and abdomen; multiple fractured bones; asymmetry and swelling on her nose; a boney deformity in her right foot; and "a healing crescent-shaped scar under her left eye." Additionally, Child M's stomach was distended, she had "quite a bit of fluid around her pancreas," and her liver enzymes were elevated, which suggested trauma. Dr. Henderson also testified Child M was malnourished and weighed only twenty-five pounds, which was "much less than the first percentile" for children her age.[2] Kala Clark, a caseworker with the Department of Social Services (DSS), testified Child M had "very thin rib cages," "over fifty knotted bumps in her head," "missing hair, scabs, [and] scratches in her head," and a burn on her face when she was removed. We find the foregoing clearly and convincingly showed Child M was severely and repetitively harmed.

Although Parents claimed they were not solely responsible for Child M, they acknowledged she lived in their home by October 2017. According to Detective Cheri Lyda, Father initially said his mother asked him to take Child M "because [she] was being passed around in the village in Guatemala."[3] However, at the TPR hearing, Father testified Child M was not sent to the United States to stay with him; she was supposed to stay with his brother Mario and Ruiz-Gonzalez.[4] We are troubled that Father's explanation changed between the time of his interview with Detective Lyda and the TPR hearing. The guardian ad litem (the GAL) entered into evidence a document purportedly signed by Child M's mother in October 2017 indicating she wanted Parents to have custody of Child M. Detective Lyda testified she reviewed photos from Mother's phone and determined Child M had lived with them for over a year. Based on the foregoing, clear and convincing evidence showed Child M lived in Parents' home at least by October 2017, if not before.

Further, clear and convincing evidence established some of Child M's injuries occurred during the time she lived with Parents. Although Dr. Henderson could not determine the timeframe for all of Child M's injuries, she opined many of them—including two fractured arm bones, three fractured ribs, and the injury to her stomach that caused excess fluid—occurred after October 2017. Dr. Henderson also opined Child's M's injuries were non-accidental injuries that were caused by

---

[2] Child M was three years old when Dr. Henderson examined her.
[3] Child M was born in Guatemala and entered the United States in September or October 2016 with Dorlisia Ruiz-Gonzalez. Investigators were unable to locate Ruiz-Gonzalez after this investigation began.
[4] Ruiz-Gonzalez was purportedly Mario's girlfriend.

child abuse. Dr. Henderson testified Child M had a pretty quick turnaround after entering DSS's custody, which suggests her injuries were more recent and her malnourishment was caused by lack of proper care. Thus, clear and convincing evidence established a child living in Parents' home was severely harmed.

Additionally, due to the severity of this harm, it is not reasonably likely Parents' home can be made safe within twelve months. Although the evidence showed Parents never physically abused Children, we have significant concerns about the severity of Child M's injuries and the fact Parents failed to seek medical help for her. We are troubled that Mother spent a significant amount of time around Child M and claimed she did not notice the injuries, and we find Parents' assertion they did not notice the injuries lacks credibility. Dr. Henderson stated Child M was admitted to the hospital due to "a lot of visible scars and bruising," and Clark testified she noticed the injuries—which included a burn on Child M's face—when Child M was removed. When Parents' neighbors, who testified as part of Father's case, were shown pictures of Child M's injuries, they both testified they would have contacted someone for help if they had noticed a child with those types of injuries. Based on the clear and convincing evidence showing Child M had noticeable and visible injuries, we do not find credible Parents' assertion that they did not notice any abuse.[5] Even if Parents did not cause Child M's injuries, we find an environment where adults are complicit in the extreme abuse of a child is not a safe environment for any child to be raised in.[6] Although Parents asserted they were afraid to seek medical help because of their immigration status, they regularly obtained medical care for their biological children, and Mother delivered Children in a United States' hospital. Thus, we find this assertion lacks credibility.

Finally, even though no evidence showed Children were physically abused, two DSS caseworkers testified Mother kissed Child 3's naked penis during a supervised visit at the DSS office. This testimony, coupled with evidence that Child 3 was sexually acting out, suggests Child 3 was sexually abused. Overall, the severity of Child M's abuse along with evidence suggesting Child 3 was sexually abused makes it not reasonably likely Parents' home can made safe for any child within twelve months.

We also find TPR is in Children's best interest. *See S.C. Dep't of Soc. Servs. v. Smith*, 343 S.C. 129, 133, 538 S.E.2d 285, 287 (Ct. App. 2000) ("In a [TPR] case,

---

[5] The family court also found Parents' testimony not credible.
[6] Parents did not implicate Ruiz-Gonzalez until the TPR hearing, which makes us question the credibility of that assertion.

the best interests of the children are the paramount consideration."); S.C. Code Ann. § 63-7-2620 (2010) ("The interests of the child shall prevail if the child's interest and the parental rights conflict."); *S.C. Dep't of Soc. Servs. v. Sarah W.*, 402 S.C. 324, 343, 741 S.E.2d 739, 749-50 (2013) ("Appellate courts must consider the child's perspective, and not the parent's, as the primary concern when determining whether TPR is appropriate.").  We acknowledge a bonding assessment showed Children were bonded with and securely attached to Father.[7]  However, based on the severity of Child M's abuse, we find a family court cannot reasonably return Children to Parents' home.  We also have concerns about testimony indicating Mother kissed Child 3's naked penis during a supervised visit, and we find that testimony coupled with evidence that Child 3 was sexually acting out suggests he may have been sexually abused.  Parents deny that occurred and they deny any knowledge of Child M's abuse, which is troubling.  Thus, it is not reasonably likely Parents can provide a suitable home for Children.

Children are all doing well in their foster homes, and their foster parents have expressed an interest in adopting them.  Although Child 3 indicated he would miss his biological family, he and Child 2 both told the GAL they would be happy to stay in their foster homes.  This suggests Children will adapt to a new home, notwithstanding any bond they may have with Parents.  On balance, based on the severity of Child M's abuse and evidence suggesting Child 3 was sexually abused, we find TPR is in the best interest of Children.

**AFFIRMED.**[8]

**LOCKEMY, C.J., and KONDUROS and MCDONALD, JJ., concur.**

---

[7] DSS did not conduct a bonding assessment with Mother because her visitation was suspended after the incident at the supervised visit.

[8] We decide this case without oral argument pursuant to Rule 215, SCACR.